# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

_____

**In re:**

GREG V. THOMASON and
DIANA THOMASON,

**Debtors.**

**Bankruptcy Case
No. 03-42400**

_____

THOMASON FARMS, INC.,
et al.,

**Plaintiffs,**

**vs.**

GREG THOMASON and
DIANA THOMASON, husband
and wife, et al.,

**Defendants.**

**Adv. Proceeding Case
No. 04-6134**

_____

MEMORANDUM OF DECISION - 1

NEW BRITIAN INVESTORS,
LLC,

    **Counterclaimant/
Cross-Claimant,**

**vs.**

THOMASON FARMS, INC.,
et al.,

    **Counter Defendants
and Cross Defendants.**

---

R. SAM HOPKINS, Trustee,

    **Counterclaimant/
Cross-Claimant,**

**vs.**

THOMASON FARMS, INC.,
et al.,

    **Counter Defendants
and Cross Defendants.**

---

**MEMORANDUM OF DECISION**

---

MEMORANDUM OF DECISION - 2

**Appearances:**

> Jay A. Kohler, Idaho Falls, Idaho, Attorney for Plaintiffs.

> W. Brent Eames, Rexburg, Idaho, Attorney for Defendants Greg and Diana Thomason.

> Craig Christensen, Pocatello, Idaho, Attorney for Defendant New Britain Investors, LLC.

> Dan Dummar, Rexburg, Idaho, Attorney for Defendant William Forsberg.

> Monte Gray, Pocatello, Idaho, Attorney for Defendant R. Sam Hopkins.

## Introduction

The Court is again called upon to adjudicate factual and legal issues arising out of disputes involving the Thomason family. This litigation includes not only family members, but also other, unrelated parties. Multiple issues are presented for resolution by the Court.

This adversary proceeding arises out of a chapter 7[1] petition filed by Greg and Diana Thomason ("Debtors") primarily to deal with the adverse financial

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101- 1330 and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, in effect prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

MEMORANDUM OF DECISION - 3

consequences of Greg's[2] expulsion from the Thomason family business.  The

Plaintiffs in this action are Greg's brothers and their spouses, Byron and Marilynn

Thomason, Nicholas and Sandra Thomason, and the family business entity,

Thomason Farms Incorporated ("TFI"; and collectively "Plaintiffs").[3]  Plaintiffs

assert claims against Debtors; Debtors' former attorney, William Forsberg; a

secured creditor, New Britain Investors ("New Britain"); and the trustee in

Debtors' chapter 7 case, R. Sam Hopkins ("Trustee").  Plaintiffs seek to quiet title

in certain farm and residential properties, in cattle, and in the corporate stock of

TFI as against the claims of the other parties.  Plaintiffs also seek a determination

by the Court that the amounts owed to TFI by Greg are excepted from discharge in

his bankruptcy case.

  New Britain purchased the claim of Robert Erikson, who had loaned

money to the Thomason family.  The claim is secured by a mortgage on some of

the farm ground at issue in this action.  In response to Plaintiffs' quiet title claims,

New Britain asks that the balance due on the loan be determined, and that its

mortgage be foreclosed.  Mr. Forsberg, who received a conveyance of farm land

---

[2] For clarity, the various Thomason parties are referred to by their first names.
No disrespect is intended.

[3] TFI  was a chapter 12 debtor from March 23, 1998, until its bankruptcy case
was dismissed on December 18, 2003.  Case  No. 98-40278.  It is in that case that the
Court first became acquainted with the Thomasons and their many family disputes.

MEMORANDUM OF DECISION - 4

from Greg and Diana in partial payment of his fees, in addition to disputing

Plaintiffs' claims, asks the Court to validate his title to one particular parcel. And

Trustee, trying to maximize the funds available for distribution to Greg and

Diana's creditors, asserts a variety of derivative and avoiding powers and asks the

Court to declare that the bankruptcy estate has an enforceable interest in much of

the land in question, in personal property, and in the stock shares of TFI. He also

seeks permission to sell certain parcels of real property and prays that TFI be

judicially dissolved based upon the actions taken by controlling shareholders

Nicholas and Byron.[4]

       To manage this action, the Court ordered that the issues be bifurcated

for purposes of trial and decision. Docket No. 45. Under this procedure, the

property-ownership, avoidance and related claims would first come on for trial.

After resolution of those issues, the Court would then conduct a second trial

addressing Debtors' right to discharge the debt to TFI. This Memorandum

addresses the issues raised at the first trial.

---

[4] There is a second, separate adversary proceeding pending between the parties, Adv. No. 04-06209, commenced by Trustee. Since all the claims Trustee asserted in his action were included in his counter- and cross-claims in this adversary proceeding, and since this action also dealt with Plaintiffs' dischargeability claims against Debtors, the parties agreed that they would utilize Plaintiffs' adversary proceeding as a vehicle to litigate the issues. Further proceedings in Trustee's action, if necessary, will await resolution of the issues here.

MEMORANDUM OF DECISION - 5

The trial consumed most of five court days.[5]  Thousands of pages of documentary evidence were admitted,[6] and ten witnesses testified.  Both written and oral arguments have been received from the parties.[7]  After a careful review of this extensive record, this Memorandum constitutes the Court's findings of fact, conclusions of law and disposition of the issues discussed below.  Fed. R. Bankr. P. 7052.

---

[5] Trial was held on September 8 and 9, December 15 and 16, 2005, and January 12, 2006.

[6]  The bulk of the documentary evidence was submitted by stipulation of the parties.  The Court appreciates the courtesy and professionalism of counsel in cooperating in this regard.  Unfortunately, many of the documents in the record are duplicates, and a large number seem only marginally relevant and were of little value to the Court in deciding the issues.  As a result, the Court labored to review the record and its decision was correspondingly delayed.

[7] Written arguments were submitted as Docket Nos. 127, 129–133 and 135–137; lengthy oral arguments were presented to the Court at a hearing on March 15, 2006.

MEMORANDUM OF DECISION - 6

## Facts[8]

## I. Background.

To begin, in an effort to give context to the legal issues, the Court

will outline the general facts involved in this action.  More fact findings are

included in the analysis of the specific issues.

### A. The Parties.

Charles (now deceased) and Doralee Thomason had four sons:

Roger, Byron, Nicholas, and Greg.  Roger, who died in the early 1980s, was

married to Sonja; Byron is married to Marilynn; Nicholas is married to Sandra; and

Greg is married to Diana.

This contest pits, in large part, Greg and Diana versus the other

Thomasons.  Both sides of this dispute believe they have been egregiously

wronged.  At times during the trial, emotions ran high and hard feelings were

evident.  In the Court's opinion, the emotional entanglements between the siblings

clearly colored the family members' testimony and their perception of critical

events.  At its heart, this is a story about a family whose members worked

─────────────────

[8]  These findings include disputed and undisputed facts.  In resolving disputed
issues of fact, the Court has carefully considered the testimony of the witnesses, and
based upon its opportunity to observe them testify, assessed their credibility.  Since the
testimony of witnesses was in some instances inconsistent with other proof, the Court's
findings reflect its judgment concerning the relative weight assigned to that testimony.

MEMORANDUM OF DECISION - 7

diligently and successfully together for many years before allowing financial

misunderstandings to tear them apart.

### B. The Family Entities.

In 1976, Charles Thomason formed Thomason Farms Incorporated

("TFI") as an entity to conduct the joint family farming operation.  TFI's original

shareholders were Charles, his unmarried sons, Nicholas, Byron and Greg, and

Roger and his spouse, Sonja.  The family farmed under the corporate banner into

the 1990s.

Prior to his death in 1992, Charles transferred his interest in TFI in

equal shares to his living sons, Byron, Nicholas and Greg.  In 1997, the brothers

bought out Sonja's TFI shares, which she had held since Roger's death, and

revised TFI's corporate bylaws.  Ex. 20.  As of 1997, it seems undisputed that

Byron, Nicholas and Greg held equal ownership of the shares of TFI stock.

Sometime in the late 1980s or early 1990s, Byron, Nicholas and

Greg formed BNG Partnership.  They created this second business entity to allow

them to receive enhanced federal farm subsidy program payments.  While no one

seems sure of the precise date the partnership was formed, it apparently existed

several years before it engaged in active farming operations.  As near as the Court

can determine, from approximately 1992 until the spring of 1997, the family

MEMORANDUM OF DECISION - 8

operated both TFI and BNG.  It was in 1997 that the family disputes erupted and that BNG was dissolved.

### C.  The Land.

The Thomason farming operation was conducted on several, separate parcels of land located in two different counties.  The ownership of several of these parcels is disputed in this action.  Specifically, there is a contest between the parties over title and ownership of the parcels they refer to as the Agren, Teton Pastures, Farmstead and Sonja's House properties.

The Agren property consists of  400 acres of farm land located in Madison County, Idaho.  The Teton Pastures property is approximately 120 acres of grazing land in Teton County, Idaho.  The Farmstead property is approximately 75 acres of farm land surrounding the two homes known as Doralee's and Sonja's houses, located in Madison County, Idaho.  What is referred to as Sonja's House property consists of the home where Roger and Sonja originally lived, and the approximately 1.55 acres that was carved out of the Farmstead property on which the house sits.

The ownership questions arise due to the manner in which the properties have been transferred from parents Charles and Doralee to, and then by, Plaintiffs and Debtors.  The status of title to the lands is complicated by family

MEMORANDUM OF DECISION - 9

agreements, written and otherwise, and by the Plaintiffs' claims that BNG held an interest in some properties prior to its dissolution.  Members of the Thomason family owned, in various capacities, each of these parcels of property, and each parcel was acquired at a different time.  The family freely transferred the land between themselves as individuals and TFI by creating their own documents, frequently drafting and executing purported documents of conveyance themselves without legal advice or assistance.   And contrary to the testimony of several of the Plaintiffs, it is not at all clear who was to own each of the properties, or what the impact of certain agreements allegedly made by family members was to have on ownership.  In fact, on more than one occasion, the same person has attempted to transfer title to the same tract multiple times.

After considering the evidence and testimony, the Court is left with the abiding belief that until hard feelings arose between Greg, Diana and the rest of the family, the family jointly enjoyed the use and benefits of all of these properties and, practically, treated the various parcels as if owned by the family as a whole, regardless of whose name may appear on a deed.  But now that family disputes have developed, the challenge for the Court is to determine the legal effect of the many deeds, agreements and instruments executed by family members regarding these parcels, all of which are subject to varying interpretations and arguments.

MEMORANDUM OF DECISION - 10

Later in this Memorandum, the Court will address and attempt to resolve the factual disputes surrounding the transfers of Agren, Teton Pastures, Farmstead and Sonja's House separately. Based upon those facts, the Court will then endeavor to reach a conclusion as to ownership of these parcels.

## II. The Origin of Family Disputes Culminating in this Action.

### A. Problems Between the Brothers.

As noted above, the brothers and their wives worked cooperatively in the family farming business for many years. But in 1997, as crop prices and farm income declined, disagreements among members of the Thomason family over management of the family business erupted.

A meeting of the TFI shareholders was convened on March 18, 1997, at Nicholas' house. Byron, Marilynn, Nicholas, Sandra, Greg, Diana and Sonja attended. During this meeting, the worsening financial condition of TFI was discussed and options debated. Greg's prior service as the manager of farming operations was a hot topic. His brothers were dissatisfied. Implicitly, if not expressly, the brothers decided that the joint farming operations could not go on as before.

The conversation turned to the status of the family members' homes, at that point considered by all to be assets of TFI. The shareholders decided that

MEMORANDUM OF DECISION - 11

title to the homes in which the brothers and their families resided would be

transferred out of TFI, presumably into individual corporations owned by each

couple or family unit.  Ex. 31 at 1.   Additionally, the minutes of this meeting

indicate the shareholders decided that BNG Partnership would be formally

dissolved, and that the debts of BNG would be assumed by TFI.  *Id.*  A corporate

resolution was prepared and signed by Nicholas and Byron which provided:

> It is agreed, as of March 18th, 1997, that Thomason
> Farms, Inc. will accept total financial responsibility for
> all true and honest operational debts of B. N. G.
> Partnership through March 18th, 1997, as long as B. N.
> G. Partnership is being dissolved and ceases to exist,
> except in the legal winding up of B. N. G. Partnership.

Ex. 31 at 2.

Another corporate meeting was held on March 27, 1997.  Only

Byron, Nicholas and Greg attended in their capacity as the sole corporate directors.

The financial circumstances of TFI was again the topic.  Ex. 32.  A real estate

agent made an appearance to discuss the possibility of selling off some of the farm

property, specifically the Agren property and the Roberts Farm where Greg

farmed, to raise cash and retire debt.  Ex. 32.  It was during this meeting Plaintiffs

allege the three brothers signed a written agreement to transfer the Agren and

Teton Pastures properties to TFI in consideration of TFI assuming BNG debts.  Ex.

3.  This home-drawn document provides in part:

MEMORANDUM OF DECISION - 12

> In consideration for the transfering [sic] of these above
> mentioned debts [*i.e.,* BNG Partnership debt], we,
> Byron T. Thomason, Nicholas A. Thomason and Greg
> V. Thomason, do also irrevocably transfer all proper
> and legal deeds of the following properties, including
> all known and unknown minerals and water shares:
>
> AGREN PROPERTY: . . .
>
> TETON PASTURE: . . . .

Ex. 3 (legal descriptions omitted).  None of the brothers' signatures were

notarized.  Curiously, Marilynn insists she witnessed the document at this time,

and the document bears her signature as such.  However, the corporate meeting

minutes indicate only Byron, Nicholas and Greg were in attendance at the meeting.

Ex. 32.

Greg denies he signed the agreement; he testified that he would

never have consented to the proposal discussed in this writing.  Indeed, he suggests

his signature on the document was forged.  Byron and Marilynn insist Greg signed

the document.  However, they are by no means unbiased when it comes to the

issues in this dispute.  In the Court's opinion, a genuine question of fact exists

about whether the brothers agreed, either by this document or in some other

fashion, to transfer the Agren and Teton Pasture properties to TFI as Plaintiffs

contend.

MEMORANDUM OF DECISION - 13

In resolving this fact issue, it seems peculiar to the Court that the minutes of the March 18 meeting expressly refer to TFI's assumption of BNG debts, and that a corporate resolution evidencing the assumption of debt was later executed, but that the transfer of these valuable farm properties from BNG to TFI would not be mentioned in either the minutes or resolution. Other than the questioned March 27 agreement, there is nothing to show that TFI's assumption of BNG debt was conditioned upon the corporation's acquisition of title to the Agren and Teton Pastures properties. Additionally, it is interesting that the corporate minutes indicate there was a discussion of either selling or leasing these properties, but no mention was made in those minutes of transferring the farm land from the individuals (or BNG) to TFI. Ex. 31. All things considered, including Greg's denial that he signed the March 27 agreement, the Court views this document with much skepticism.

By July 1997, the tension between Greg and his brothers had escalated. On July 7, a letter was sent to Greg by an attorney representing Plaintiffs informing Greg that he should not harvest any crops off the Roberts Farm. Ex. 538. While the trigger for suspicion about Greg's conduct is unclear, Marilynn also began to review the books and records of TFI and BNG about this time. This was unusual, since for the previous several years, neither Byron nor

MEMORANDUM OF DECISION - 14

Nicholas participated much in the management of the corporate or partnership finances, leaving such matters solely to Greg by default. As a result of her inquiries, Marilynn concluded, and Byron and Nicholas agreed, that Greg was guilty of, at least, mismanagement of the joint farming operation. Indeed, they suspected Greg had misappropriated family funds. As a result, Byron and Nicholas decided to oust Greg as the manager of TFI, and prohibited him from participating any longer in the farming business.

## B. Forsberg Represents Greg and Diana.

On March 23, 1998, because of its dismal financial condition, TFI filed for chapter 12 bankruptcy protection. Byron and Nicholas signed the petition on behalf of the corporation. Ex. 316. While that case was pending, on February 23, 1999, TFI, Byron, Marilynn, Nicholas and Sandra commenced an adversary proceeding against Greg and Diana based upon Marilynn's review of the books, claiming Greg had converted TFI funds. To represent them in this adversary proceeding, Greg and Diana hired attorney William Forsberg. Mr. Forsberg assisted Greg and Diana throughout the protracted litigation.[9]

---

[9]   After a long trial, the Court issued its Memorandum of Decision in the chapter 12 adversary proceeding on February 21, 2002. The Court determined that Greg did indeed owe the company $86,439.47. *See* Mem. Decision Adv. No. 99-6036 at 45–48, Ex. 33. But this outcome surely disappointed Greg's brothers who, based upon what the Court determined to be the terribly flawed review conducted by Marilynn, alleged Greg owed TFI over $1 million. TFI's claim that Greg was guilty of fraud or conversion,

By the conclusion of the adversary proceeding, Greg and Diana owed Mr. Forsberg about $70,000 in attorney fees. Greg was adamant that Mr. Forsberg be compensated for his services. Since they lacked cash, Greg and Diana deeded their interests in the Agren and Farmstead properties to Mr. Forsberg in March 2002. Plaintiffs challenge the efficacy of these transfers arguing Greg lacked any individual interest in Agren to transfer, and that certain restrictive covenants prevented the transfer of the Farmstead property.

Greg and Diana filed their chapter 7 bankruptcy case on November 7, 2003. In response to Trustee's arguments that the transfers were avoidable, Mr. Forsberg and Trustee entered into a compromise, later approved by this Court. Trustee agreed to forego his efforts to avoid Mr. Forsberg's interest in the Farmstead property, and in exchange, Mr. Forsberg agreed to transfer his interest in the Agren property to Greg and Diana's bankruptcy estate. Ex. 575.

### C. The "Foreclosure" of Greg's TFI Stock.

Because they alleged he owed the company many thousands of dollars, during the pendency of Plaintiffs' adversary proceeding against Greg and Diana in the chapter 12 case, Byron and Nicholas, acting as shareholders and

---

however, as opposed to simply overdrawing against his business account, was not decided and forms the basis of Plaintiffs' exception to discharge claim in this action against Greg and Diana.

MEMORANDUM OF DECISION - 16

directors of TFI, decided to foreclose Greg's interest in his shares of TFI stock.

On January 10, 2000, TFI sent Greg a letter notifying him that a special

stockholders and directors meeting would be held.  The notice was allegedly sent

by both regular and certified mail, return receipt requested.

It does not appear that Greg ever "signed" for the certified letter.  Ex.

22.  Greg denies ever receiving any correspondence or notice regarding

repossession of his stock.  The special meeting was held on February 26, 2000,

with Byron and Nicholas present along with their wives, Marilynn and Sandra.

Ex. 23.  Greg did not attend.  The meeting minutes indicate the stockholders

present discussed the procedures that would be used to "repossess" Greg's stock.

Ex. 23.  Byron and Nicholas also adopted a corporate resolution to begin this

process.  Ex. 24.

A second notice was sent to Greg around October 1, 2000, informing

him that another special meeting would be held on November 1, 2000, to address

"the payback of funds missing and/or not accounted for as well as matching capital

accounts of Byron T. Thomason and Nicholas A. Thomason so all stock are valued

equally[.]"  Ex. 25.  The notice contained no details as to the amount TFI alleged

Greg owed the company.  Greg claims he also did not receive this notice.

MEMORANDUM OF DECISION - 17

The special meeting was held on November 1, 2000, and Nicholas, Byron and Marilynn attended. Greg did not. Ex. 26. Byron and Nicholas unanimously adopted a corporate resolution purporting to forfeit Greg's stock as of January 1, 2001, if he "fails to pay the missing monies/unaccounted monies back to Thomason Farms, Inc., before January 1, 2001 to [TFI's chapter 12] Bankruptcy Trustee-Forrest Hymas in addition to bringing his (Greg V. Thomason) capital account equal to the capital accounts of Byron T. Thomason and Nicholas A. Thomason." Ex. 27. Greg made no payments to TFI.

In March 2001, Plaintiffs assert they sent a final notice concerning the stock "repossession" to Greg by regular and certified mail. Greg signed a receipt for this letter. Ex. 29. However, Greg insists the envelope contained only a bill for rents due to TFI for Greg's home, and no information about a stock repossession.

When Greg failed to pay TFI the funds allegedly owed, Plaintiffs argue they foreclosed Greg's stock ownership in accordance with the 1997 Amended Bylaws of TFI that provided the corporation would have a lien on stock for shareholder debts. However, the Amended Bylaws, Exs. 20–21, provide no specific procedure to be used to foreclose this lien. Not surprisingly, then, while Plaintiffs argue Greg lost his stock in TFI through this private "foreclosure,"

MEMORANDUM OF DECISION - 18

Debtors and Trustee argue the procedure employed by Plaintiffs was ineffective to strip Greg of his stock. They remind the Court that, even if Greg received the various notices in question from TFI, at no time was he ever informed of the amount of debt his brothers and TFI alleged he owed, or the amount required to equalize his capital account.[10] Additionally, Greg points out that no value was ever placed on his stock when it was "repossessed," nor has he been given any credit as a result of the foreclosure on his shares against any amounts he allegedly owes.

Trustee challenges the validity of this stock forfeiture. Trustee, with Greg's support, alleges Greg, and now his bankruptcy estate, continues to own one-third of TFI's stock. As explained below, Trustee's argument has merit. Through this process, it appears that Nicholas, Byron and TFI attempted, albeit ineffectively, to simply confiscate Greg's stock interest without any semblance of due process, and without ever assigning a value to the stock or giving credit to Greg for amounts alleged to be owed to TFI.[11]

---

[10] Of course, during the same period of time that Nicholas, Byron, and TFI were attempting to foreclose on Greg's stock, they were in this Court litigating with Greg over the unliquidated amounts he allegedly owed the company. They did not ask to foreclose any lien on Greg's stock in that action. And recall, while the corporation sought millions from Greg, the eventual amount determined to be owing was closer to $86,000.

[11] While not an issue here, in addition to attempting to foreclose Greg's stock, TFI also evicted Greg, Diana and their children from what had always been their home,

MEMORANDUM OF DECISION - 19

### III. Trustee's Claims Against Plaintiffs.

In addition to his arguments that Greg and Diana own an interest in the real and personal property here in dispute, Trustee seeks to avoid Plaintiffs' interests in several of the properties by invoking his powers under §§ 544, 547 and 548 of the Bankruptcy Code.[12]

On April 18, 2004, a "Real Property Mortgage and Chattel Property Lien" was filed relating to the Agren property. This instrument represents that Byron, Marilynn, Nicholas and Sandra are creditors of TFI, and that to secure repayment of sums owed to them by the corporation, "the above mentioned creditors will jointly hold a first and sole position on: [legal description of Agren]." Ex. 501 at 1.[13] The document contains the following language:

_____

record title to which was held by TFI in 2003. TFI then sold the home on October 24, 2003. Ex. 534. As with the stock, Greg never received any credit for the loss of his home against what Plaintiffs claim he owes.

[12] In addition, in his Complaint, Trustee requests the Court declare void state court actions Plaintiffs filed in both Madison and Teton counties after Debtors filed for bankruptcy protection. Trustee asserts these actions were filed in February 2004, in violation of the automatic stay. However, after reviewing the record, the Court did not find nor did Trustee direct the Court to any evidence concerning these lawsuits. Therefore, the Court will not address this issue.

[13] As with many of the documents appearing of record in this case, Nicholas, Byron or Marilynn likely drafted this document. Plaintiffs' "kitchen table" drafting efforts have accomplished little except to complicate the issues and impair the marketability of title to these lands.

MEMORANDUM OF DECISION - 20

> Thomason Farms, Inc. does this strictly to protect any
> and all legal creditors of Thomason Farms, Inc. in light
> of the recent and possible illegal demands made upon
> Thomason Farms, Inc. by entities demanding funds to
> be paid to them.  These demands have been forwarded
> to the Department of Justice.

Ex. 501 at 2.  This instrument was created and recorded after Greg and Diana filed

their bankruptcy case, and after Trustee began his effort to assemble their assets

for liquidation.  Byron testified that the party referred to in this "mortgage" as

allegedly making "illegal demands" to TFI concerning this property was Trustee.

Trustee seeks to avoid any interests Plaintiffs claim as a result of executing and

recording this instrument.

Trustee also challenges any rights Plaintiffs may claim under a

document labeled "Lis Pendens," filed in the Madison County property records on

June 9, 2003, and describing the Agren and Farmstead Properties.  Ex. 52.  Trustee

questions the effect of a similar instrument recorded in Teton County on June 16,

2003, describing the Teton Pastures property, Ex. 53.  Trustee argues that Plaintiffs

gave no value for any rights acquired under these instruments, and that they were

recorded by Plaintiffs in an inappropriate attempt to secure Plaintiffs' position in

Debtors' bankruptcy case.   Plaintiffs contend that they were within their rights to

record these notices since they are the true owners of all the property involved, and

neither Trustee nor Greg have any interest in the properties.

MEMORANDUM OF DECISION - 21

Trustee also challenges several transfers of TFI property made both shortly before and after Debtors filed for bankruptcy relief. In addition, Trustee seeks to have the Court determine whether the $86,000 judgment and corresponding lien TFI obtained against Greg, and filed for record in both Madison and Teton counties, constitutes a valid lien against the Agren and Teton Pastures properties.

### IV.  This Adversary Proceeding.

As noted, in this action, the Court must resolve a number of the issues. To do so requires a framework.

First, the Court will decide whether Greg remains a stockholder in TFI, or whether that company, acting through the other shareholders, has effectively "foreclosed" Greg's shares. Second, the Court will address the dispute between Byron, TFI, Greg and Trustee as to the ownership of certain cattle. Third, the Court will examine and resolve the parties' claims to title to the Agren, Teton Pastures, Farmstead and Sonja's House properties. Fourth, the Court will address Trustee's claims against Plaintiffs, including Trustee's claims to avoid property transfers, his request to dissolve TFI, and his requests to sell certain of the farm properties free and clear of any co-ownership interests.

MEMORANDUM OF DECISION - 22

**Discussion and Disposition of the Issues**

**I.  The Attempted Foreclosure of Greg's Stock by TFI was Ineffective.**

At the time he was removed as the manager of the family business in early 1997, Greg owned one-third of the shares of stock in TFI.  Plaintiffs assert that in 2001, TFI repossessed and foreclosed upon Greg's shares because Greg failed to pay his debts to the corporation.  Plaintiffs contend that the procedure TFI used to effect this foreclosure was adequate under its bylaws and applicable law.  Plaintiffs' argument, without citing to any authority, is that because the bylaws are silent as to the foreclosure procedure, any reasonable manner giving Greg notice and an opportunity to cure his default to the company was acceptable.  Pls.' Closing Br. at 13, Docket No. 127.

Greg and Trustee disagree that the procedure employed by Plaintiffs was legally sufficient.  They maintain that Greg received no effective notice of the foreclosure procedure, of what debt was due or of the amount required to cure any default.  In addition, they point out that no value was ever placed upon Greg's stock, nor did he receive any credit against the alleged debt for the loss of his stock.  Greg and Trustee maintain Greg remains a TFI shareholder.

"Shares of stock in a corporation are personal property."  *State v. Dunlap*, 156 P. 1141, 1145 (Idaho 1916).  "Because corporate documents are

MEMORANDUM OF DECISION - 23

equivalent to contracts among the members of the association, the normal rules

governing the interpretation of contracts apply." *Twin Lakes Village Prop. Assoc.*

*v. Aune*, 857 P.2d 611, 614 (Idaho 1992). Thus, the rights associated with

ownership of stock in a corporation are set out in its bylaws. Actions taken in

contravention of applicable bylaws are void. *Id.*

TFI's bylaws contain no procedure to foreclose a lien on shareholder

stock. In the absence of an express provision in a contract, there exists "all such

implied provisions as are necessary to effectuate the intention of the parties, and as

arise from the specific circumstance under which the contract was made." *Davis v.*

*Prof. Bus. Servs., Inc.*, 712 P.2d 511, 514 (Idaho 1985). While the bylaws clearly

provide for a lien, in the absence of an express foreclosure procedure, the Court

must decide whether the procedure utilized to enforce the lien was appropriate.

Because the bylaws are silent, the Court concludes the parties

presumably intended that the general Idaho law apply to foreclosure of the lien

under these circumstances.[14] However, no Idaho statute would seem to prescribe

the procedure applicable to foreclosure of a contractual lien by a corporation on a

stockholder's shares. The Idaho Court of Appeals has, in another similar context,

---

[14] The Court presumes that the parties did not intend that a shareholder's stock
simply be forfeited upon failure to pay a debt owed to the company. Under Idaho law,
had the parties agreed to forfeiture as the method of lien enforcement, such a provision
would be void. *See* Idaho Code § 45-110.

MEMORANDUM OF DECISION - 24

concluded that if there is no applicable statutory procedure, "[a] court in equity may determine the scope of the lien and how it will be enforced in each case." *Quintana v. Anthony*, 712 P.2d 678, 681 (Idaho App. 1985) (deciding that a judicial mortgage foreclosure proceeding may be required by the court to foreclose a vendor's lien). Thus, in this instance, the Court must exercise its equitable discretion to determine how the stock lien should have been enforced.

A formal foreclosure process was required under these facts because the grant of the lien in favor of TFI on Greg's stock did not, standing alone, give the company title to the stock. "Notwithstanding an agreement to the contrary, a lien, or a contract for a lien, transfers no title to the property subject to the lien." Idaho Code § 45-109. Thus, TFI was unable to simply assume ownership of the stock upon Greg's alleged failure to pay his debt to the corporation.

In the absence of any contractual or statutory procedure, the Court concludes a judicial foreclosure of the stock lien was necessary in this case. Requiring a judicial proceeding would have ensured that Greg receive adequate and timely notice of TFI's claims against him, and an opportunity to object before his valuable property right was lost.[15] A judicial action would have also provided

---

[15] Idaho Code § 45-1302 would require, of course, that Greg be named as a party defendant in any judicial action to foreclose the stock lien. His participation as a party-defendant would, in turn, require proper service of notice of the action, and provide a process by which he could have asserted defenses to the foreclosure.

MEMORANDUM OF DECISION - 25

a fair and impartial means of adjudicating the amount Greg owed the company, and the value to be placed on Greg's stock so that an appropriate credit could have been made against any amounts owed.

Instead, here Plaintiffs effectively forfeited Greg's interest in TFI stock.  Indeed, TFI has not shown that Greg received any sort of timely, effective notice of the purported foreclosure process.  And it is undisputed that, even if Greg received all the letters that TFI allegedly sent to him, the information contained in those letters did not provide any significant details regarding the amount Greg allegedly owed the company, nor the value to be assigned to his shares of stock.  In addition, TFI apparently took no steps to value Greg's stock when it acquired it, nor did the company give Greg credit for the value of the stock as against any debt he owed TFI.[16]  Simply put, the procedures employed by TFI were ineffective in every way to justify stripping Greg of his ownership interest in TFI stock.

The Court concludes that, lacking a contrary provision in the bylaws, a judicial foreclosure of the stock lien was required under these facts.  The purported "foreclosure" of Greg's shares of stock in this instance was void and

---

[16]  While not suggesting that such a procedure would have been legally adequate, the Court notes TFI also failed to follow the procedures set out in its own bylaws to effectuate a transfer of shares.  Those bylaws require that shares of stock first be offered for sale to other shareholders, and if a sale price cannot be agreed upon, establishes a process for valuation of those shares.  Bylaws at 23–25, Docket No. 20.

MEMORANDUM OF DECISION - 26

ineffective.  Greg's bankruptcy estate therefore owns one-third of the shares of TFI

stock.

## II.  The Cattle.

Greg and Trustee claim TFI owns certain cattle that are pastured on

the Teton Pastures property.  Greg contends the current cattle devolved from a

herd originally transferred by Charles to TFI, or by Charles to his three surviving

sons.

Byron responds to this claim in two alternative ways.  First, Byron

maintains TFI sold its cattle, and Byron rebuilt the present herd using his own

funds.  And second, without much explanation, Byron claims he acquired the cattle

from Charles prior to the sale.  Complicating matters are various documents that

could be used to support a variety of positions regarding the ownership of the

cattle.

On February 24, 1976, Charles, Byron, Nicholas and Greg executed

a Bill of Sale transferring several items, including 125 head of cattle, to TFI.  Ex.

522.  Then, in a 1991 memorandum evidencing a verbal agreement made in 1984,

Charles and Doralee transferred, among other things, cattle to Byron, Nicholas and

Greg.  Ex. 1.  TFI did not list any interest in cattle on its Schedule B, filed in its

chapter 12 case on March 23, 1998, Ex. 584, and Byron testified that TFI did not

MEMORANDUM OF DECISION - 27

own any cattle when it filed for bankruptcy protection. However, on its income statement for 1998, $21,710 is listed as income from cattle. Ex. 569. Again in 2000, tax documents indicate income of $18,570 from cattle. Ex. 570.

Byron's testimony is, at best, unclear as to his ownership of the cattle. He claims that his parents, or possibly just his mother, transferred the family cattle brand to him individually, however he is not sure when this occurred. Byron testified that in 1997 he began to purchase feed for the cattle with his own funds, and so the cattle became his. Additionally, during TFI's chapter 12 case, Byron testified he maintained the cattle, not TFI. Then in 2000 or 2001, Byron liquidated the herd to raise funds, all of which he testified were used to pay TFI expenses. Then, in late 2001 or early 2002, Byron testified he and Marilynn raised enough capital to repurchase some cattle, although he does not remember where he obtained the funds. These are the cattle currently pastured on the Teton Pastures property. Thus, Byron insists he owns these cattle.

Nicholas testified that it was his understanding that the cattle had been transferred by Charles to TFI. Nicholas was not aware of any transfer of the cattle to Byron. His testimony is consistent with that of Greg, who testified that the cattle were transferred to TFI, although Byron always cared for the cattle.

MEMORANDUM OF DECISION - 28

Under Idaho law, "a recorded brand shall be prima facie evidence of ownership of livestock, and that such owner is entitled to possession of said livestock." Idaho Code § 25-1143. To prove ownership of a brand the owner must offer the "original certificate issued to said owner by the state brand inspector, or a certified copy of the recorded brand issued by the state brand inspector. Parol evidence shall be inadmissible to prove the ownership of any recorded brand." *Id.* No evidence was submitted to show the brand on the cattle, or that they were branded at all. Nor did Byron offer his brand certificate as prima facie evidence of ownership of the cattle, assuming they bear the brand allegedly assigned to him by his mother. While it would have been simple to do so, the Court cannot rely on the brand to establish ownership in this case. *See Servel v. Corbett*, 290 P. 200, 202 (Idaho 1930).

The only other evidence before the Court to show that Byron owned the cattle prior to any sale is his own testimony. On the other hand, the documentary evidence, and the testimony of both Nicholas and Greg, all support that TFI, not Byron owned the cattle. The Court does not doubt that because the responsibility to care for the cattle fell to Byron, he believes the cattle were his. But proof, and not Byron's feelings, is required. Therefore, the Court concludes that prior to the sale of the herd, the cattle were owned by TFI.

MEMORANDUM OF DECISION - 29

In spite of the above, there was no evidence offered to dispute Byron's testimony that even if TFI owned the herd, it was sold in 2000 or 2001, and the proceeds used to pay TFI debt. Once sold, the cattle are no longer assets of TFI. And no one disputes that Byron and Marilynn purchased the cattle now grazing on family property using their personal funds. On this record, the Court concludes the cattle now grazing on the Teton Pastures property belong to Byron and Marilynn.

### III. Real Property Title Issues.

The Court must determine the interests of the parties in the various parcels of property now in dispute.[17] Since this action arises out of a bankruptcy filing, the Court is particularly concerned with the extent of Debtors' interests in the properties since, under § 541(a)(1), Debtors' bankruptcy estate includes "all legal or equitable interest of the [Debtors] in property as of the commencement of the case." The extent of the Debtors' interests in property is determined under state law. *In re Tippett*, 338 B.R. 82, 86 (9th Cir. BAP 2006) (citing *Butner v.*

---

[17] Plaintiffs ask the Court to quiet title to the property known as Nicholas' house. However, none of the Defendants appear to challenge that Nicholas owns this property. The only deed dealing with this house admitted in evidence was recorded on February 25, 2004, wherein TFI transferred the property to Nicholas and Sandra. Ex. 503. Due to the lack of a competing claim, there is no issue to resolve, and the Court need not enter any order regarding this property.

MEMORANDUM OF DECISION - 30

*U.S.*, 440 U.S. 48, 54–55 (1979); *In re Lowenschuss*, 170 F.3d 923, 929 (9th Cir. 1999)).

Several time-honored Idaho statutory and decisional rules are implicated in this analysis.  Under Idaho law, a conveyance of real property

> [is] made by an instrument in writing, subscribed by the party disposing of the same, or by his agent thereunto authorized by writing. The name of the grantee and his complete mailing address must appear on such instrument.

Idaho Code § 55-601.  "A fee simple title is presumed to be intended to pass by a grant of real property unless it appears from the grant that a lesser estate was intended."  Idaho Code § 55-604.  Additionally, "[e]very interest in real estate granted or devised to two (2) or more persons, other than executors or trustees, as such constitutes a tenancy in common, unless expressly declared in the grant or devise to be otherwise."  Idaho Code § 55-508.

"Idaho law presumes that the holder of title to property is the legal owner of that property."  *Luce v. Marble*, 127 P.3d 167, 173 (Idaho 2005) (citing *Hettinga v. Sybrandy*, 886 P.2d 772, 774 (Idaho 1994); *Russ Ballard & Family Achievement Inst. v. Lava Hot Springs Resort, Inc.*, 548 P.2d 72, 79 (Idaho 1976)).  "One who would claim the ownership of property of which legal title stands or record in another . . . must establish such claim by evidence that is clear,

MEMORANDUM OF DECISION - 31

satisfactory and convincing." *Luce*, 127 P.3d at 173 (quoting *Russ Ballard &*

*Family Achievement Inst.*, 248 P.2d at 79).

"A grantor can convey nothing more than he or she owns, and

ordinarily a grantee acquires nothing more than the grantor owns and can convey."

*Luce*, 127 P.3d at 173 (citing *Gardner v. Fliegel*, 120 P.2d 990, 993 (Idaho 1969)).

"A quitclaim deed conveys whatever interest the grantors possess at the time of

conveyance." *Luce*, 127 P.3d at 173 (citing *Scogings v. Andreason*, 418 P.2d 273,

277 (Idaho 1966)).

With these rules in mind, the Court will examine the parties' claims

to the various parcels in turn.

### A.  Agren Property.

The legal description for the Agren property is:

Township 5 North, Range 38 East, Boise Meridian,
Madison County, Idaho.
Section 1: SE1/4SE1/4
Section 12: NE1/4NW1/4, S1/2NW1/4, SW1/4, N1/2NE1/4

Ex. 514.  The previous owners transferred title to this land to Byron, Nicholas and

Greg as individuals in fee simple, as evidenced by a deed recorded on May 1,

1990.  Ex. 519.

MEMORANDUM OF DECISION - 32

According to the county records, the title to this parcel was held by Byron, Nicholas and Greg until Greg and Diana[18] conveyed their interest to Mr. Forsberg in satisfaction of the attorney fees they owed him.  This transfer was accomplished via a deed recorded on October 30, 2001, Ex. 8, and later, a correction deed executed and recorded on March 7, 2002.  Ex. 9.

Then, in October 2002, Mr. Forsberg executed a quitclaim deed reconveying his interest in the Agren property to Greg and Diana with the exception of the SW1/4 of the property, consisting of approximately 160 acres.  This quitclaim deed was recorded on October 22, 2002.  Ex. 402.  Mr. Forsberg testified this was done after he learned there could be a dispute as to ownership of a portion of the Agren property due to the legal descriptions contained in some deeds that omitted the SW1/4.  Forsberg did not reconvey the SW1/4 because it was his belief that there could be no dispute as to the ownership of that portion of the property.

After Debtors filed their bankruptcy petition, in September 2004, Trustee and Mr. Forsberg agreed to a compromise of the Trustee's avoidance claims against Mr. Forsberg.  Under that arrangement, which this Court approved,

---

[18]  All parties seem to agree that the Thomason brothers' wives hold a community property interest in all the parcels of property acquired by Byron, Nicholas and Greg after their marriages.  *See* Idaho Code § 32-906.  As a result, the spouses were required to execute any instrument conveying an interest in the properties.  Idaho Code § 32-912.

MEMORANDUM OF DECISION - 33

Mr. Forsberg agreed to give up his ownership of the SW1/4 of the Agren property, in return for Trustee's promise not to seek to avoid Forsberg's interest in the Farmstead property, which had also been transferred to him by Debtors to pay his fees. Ex. 275. Under the terms of this compromise, Forsberg claims no interest in Agren, although apparently no deed has been executed or recorded to transfer his interest to the bankruptcy estate.

Byron, Marilynn, Nicholas and Sandra executed and recorded a deed on August 6, 2003, transferring their interests in the Agren property to TFI. Ex. 509. Greg and Diana did not sign the deed, although their names were listed on this document as grantors. Instead of obtaining Greg and Diana's signatures, Plaintiffs attached a copy of the March 27, 1997 agreement, a document Greg disputes he signed, as evidence that TFI was to receive the brothers' interests in the Agren property in consideration of TFI assuming the BNG debts. Ex. 509.

On April 18, 2004, TFI granted a mortgage on the Agren property to Byron, Marilynn, Nicholas and Sandra to secure monies allegedly due them from the company. Ex. 501. The mortgage specifies that Byron, Marilynn, Nicholas and Sandra are to "hold a first and sole position" on the property.[19] Ex. 501.

---

[19] The validity of this mortgage as against Trustee is discussed in connection with his avoidance claims below.

MEMORANDUM OF DECISION - 34

Based upon these events, Plaintiffs argue Greg and Diana (and consequently, their bankruptcy estate) have no ownership interest in the Agren property. Instead, relying upon the disputed March 27, 1997 agreement to transfer property, Plaintiffs assert that TFI owns the property subject to the mortgage granted by TFI to the individual Plaintiffs.

Additionally, although the county records show the Agren property was originally acquired by Byron, Nicholas and Greg as individuals, Plaintiffs argue BNG Partnership funds were actually used to purchase Agren. As a result, Plaintiffs insist the land was actually owned by BNG. Building on this argument, Plaintiffs contend that when TFI agreed to assume BNG partnership debt, TFI acquired the property by way of the agreement, Ex. 3. To further support their contention that the Agren property was owned by BNG, Plaintiffs point to a Farm Credit Services loan application balance sheet that Greg signed in 1994, wherein he indicated the land was BNG property. Ex. 14. Plaintiffs also offered in evidence several checks issued for payments for the purchase of the Agren property drawn on Greg's BNG account. Ex. 13.

The evidence of BNG's interest in the Agren property is not as clear as Plaintiffs suggest. After the dissolution of BNG, Byron signed a loan application on May 5, 1997, wherein he represented that the Agren property was owned by the individual Thomason brothers, not the partnership or TFI. Ex. 317.

MEMORANDUM OF DECISION - 35

There is additional evidence to show that the Agren property was owned by the individuals.  When Byron and Nicholas put TFI in to chapter 12 in 1998 (long after TFI purportedly acquired title via the March 27, 1997 "agreement"), they did not list the Agren property as TFI's real property.  Sched. A, Ex. 317.  And recall, Byron, Nicholas and their wives, *as individuals*, signed a deed in August 2003 purporting to transfer their interests in the Agren property to TFI.  This purported transfer also lends credence to the notion that the individuals did not intend for either BNG or TFI to own an interest in the Agren property prior to that time.  Therefore, at best, the proof concerning ownership of the Agren property is equivocal.

Plaintiffs contend that Agren is BNG partnership property because it was acquired with partnership funds.  Under Idaho law at the time the property was purchased, "property acquired with partnership funds is partnership property unless a contrary intent is shown."  *Lettunich v. Lettunich*, 111 P.3d 110, 115 (Idaho 2005) (citing Idaho Code § 53-308 (repealed 2001)[20]).  But intent is a question of fact.  *Lettunich*, 111 P.3d at 115.

The evidence is conflicting.  The Court is persuaded and therefore finds that the Thomasons did not intend that BNG partnership own the Agren

---

[20]  Since the property was acquired prior to the repeal of Idaho Code § 53-308, that statute applies in this instance.

MEMORANDUM OF DECISION - 36

property.  While BNG may have been in existence in 1990 when the brothers

acquired the Agren property, they did not begin operating under the BNG name

until 1991 at the earliest.  Greg made land payments for the Agren property

beginning in 1993 from his BNG Partnership account, and on one document

indicated it was partnership property, Exs. 13–14.  But these facts are not

sufficient, in the Court's view, to overcome other, conflicting evidence that the

individual brothers, not BNG, owned the Agren property.  In addition, Agren was

not listed by Byron and Nicholas as an asset on TFI's original bankruptcy

schedules, and Byron indicated on a later loan application that Agren was owned

by the individuals and that no partnership existed.  Exs. 209, 317.  The original

deed to the Agren property conveyed an interest to the brothers, including Greg, as

co-owners.  The presumption arising from the names contained in that deed has not

been overcome.  The Court finds that the weight of the evidence is that the parties'

intended that Byron, Nicholas and Greg own Agren as tenants-in-common.

Plaintiffs assert the March 27, 1997 agreement effectively

transferred various properties, including the Agren property, to TFI.  The Court

disagrees.  First of all, the document is not a deed, nor does it clearly provide that

any real property is to be transferred to TFI.  But even if the agreement is read to

do so, it does not constitute an effective instrument of conveyance.  The document

was not recorded until it was attached to an August 2003 deed, nor did it contain

MEMORANDUM OF DECISION - 37

the required address of the grantee.  Idaho Code § 55-601.  The signatures on the

agreement were never acknowledged as required prior to its recording.  Idaho

Code § 55-701 *et seq*; § 55-805.  The Court concludes that the March 27, 1997

agreement did not effectuate any transfer of real property.  In addition, as

discussed above, Plaintiffs have not persuaded the Court that Greg ever signed this

agreement, something he vigorously disputes.

All things considered, the Court prefers to rely upon the contents of

the original deed by which the Agren property was acquired to dispose of the

issues concerning ownership of this land.  The Thomason brothers acquired title as

tenants-in-common.  TFI, by virtue of the August 2003 conveyance from Byron,

Nicholas and their spouses, now owns an undivided two-thirds interest in the

Agren property.  Greg and Diana (and through them, now their bankruptcy estate)

hold an undivided one-third interest in the Agren property, with the exception of

the SW 1/4.  Mr. Forsberg, by virtue of the conveyances made to him by Greg and

Diana, holds an undivided one-third interest in the SW 1/4 of Agren.  *See* Exs. 9,

12, 402, 509, 519.  Mr. Forsberg's interest, while still appearing of record, is of

course subject to the compromise agreement entered into with Trustee.

### B.  Teton Pastures.

### 1.  The property and status of the county records.

The legal description for the Teton Pastures property is:

MEMORANDUM OF DECISION - 38

> Lots 2 and 3 and the SE1/4NW1/4 of Section 31,
> Township 6 North, Range 45 East, Boise Meridian,
> Teton County Idaho.

Ex. 517.  Byron testified the property has always been used exclusively for

grazing cattle.  The property is approximately 120 acres in size; some portions

consist of  high ground with gravel, while others portions of the land are lower

with water.

On July 9, 1992, a deed was recorded in Teton County wherein

Charles and Doralee were grantors conveying the Teton Pastures property to

Byron, Nicholas and Greg as individuals.  Ex. 338.  Curiously, after Charles'

death, on July 29, 1993, Doralee, as Charles' personal representative, executed and

recorded another warranty deed conveying the same property to Byron, Marilynn,

Nicholas, Sandra, Greg and Diana.  Exs. 339, 517.  Then, on November 18, 1993,

Doralee executed and recorded yet another deed to Teton Pastures, but this time as

an individual, conveying the property to Byron, Nicholas and Greg, but omitting

their spouses.  Ex. 341.

On February 16, 2001, Byron and Nicholas (without their spouses)

signed a quitclaim deed transferring the Teton Pastures property to TFI.  Greg

refused to sign this deed.  Ex. 37.

Then, on June 16, 2003, a deed that apparently had been executed by

Charles and Doralee on February 24, 1976, was recorded in Teton County.  Ex. 11.

MEMORANDUM OF DECISION - 39

This deed purports to transfer the Teton Pastures property to TFI. It had

apparently been erroneously recorded in Madison County on August 26, 1977.

There is no evidence that, prior to its recording in Teton County, the 1976 deed

had ever been delivered to the Thomason brothers, or that they were even aware of

its existence. Instead, the 1976 deed appears to have been in the custody of

Charles' and Doralee's attorney.[21]

Plaintiffs contend that TFI owns the Teton Pastures property based

on the February 1976 deed.[22] They refuse to recognize that Greg or Diana hold

any interest in the property. Trustee contends Greg and Diana, and now their

bankruptcy estate, hold an enforceable undivided one-third interest in Teton

Pastures.

### 2. New Britain's Mortgage.

---

[21] Of course, in addition to execution, a deed must be delivered to the grantee to effect a valid conveyance. *Blankenship v. Myers*, 544 P.2d 314, 325–26 (Idaho 1975). Arguably, because the 1976 deed was unknown to the Thomason brothers until it was discovered and recorded in Teton County in 2003, long after the other deeds from Charles and Doralee had been executed, delivered and recorded, the 1976 deed has no impact on title to the Teton Pastures property.

[22] Plaintiffs also argue that Greg transferred the Teton Pastures property to Mr. Forsberg in an attempt to launder the title through Mr. Forsberg. Pls.' Closing Br. at 29, Docket No. 127. However, Plaintiffs failed to cite to such deeds and the Court did not find any in the evidentiary record. Therefore, the Court does not address this argument.

MEMORANDUM OF DECISION - 40

On July 28, 1993, Byron, Marilynn, Nicholas, Sandra, Greg and

Diana all signed a promissory note agreeing to repay Robert Erikson $100,000

they had borrowed from him.  Ex. 300. The note provides:

> FOR VALUE RECEIVED I, WE OR EITHER OF US
> PROMISE TO PAY TO THE ORDER OF ROBERT
> ERIKSON or at such other place as the holder may
> designate in writing THE PRINCIPAL SUM OF One
> Hundred Thousand and No/100 DOLLARS
> ($100,000.00) with interest from July 28, 1993 at the
> rate of Eleven per centum (11%) per annum, lawful
> money of the United States of America in installments
> as follows:
>
>> Interest payments only beginning August
>> 28, 1993 and on the 28th day of each
>> successive month thereafter until July 28,
>> 1998 at which time any accrued interest
>> plus principal amount will be due in full.
>> There is no prepayment penalty. This
>> note is secured by two (2) recorded
>> Mortgages.

Ex. 300.  The next day, a Real Estate Mortgage in favor of Mr. Erikson covering

the Teton Pastures property, securing the note, and signed by Byron, Marilynn,

Nicholas, Sandra, Greg and Diana, was  recorded.  Ex. 301.  Byron and Marilynn

also secured the promissory note via a mortgage granted to Mr. Erikson on their

home in Madison County.[23]  Ex. 302.

---

[23]  Testimony established that the mortgage on Byron and Marilynn's property
was eventually released by New Britain so that they could use the Madison County
property as collateral to obtain a loan to pay New Britain the money due on the

MEMORANDUM OF DECISION - 41

The Thomasons defaulted on the payments due under the note.
Though it was in default, on December 3, 1999, New Britain Investors purchased
the note from Erikson; the corresponding mortgages were also assigned to New
Britain. Exs. 303–305. New Britain sent a notice of default to each of the
Thomason couples on February 16, 2000. Exs. 307–309. The note was not paid.
New Britain then filed a foreclosure action in state court on March 23, 2000. Ex.
310. Byron, Marilynn, Nicholas and Sandra filed an answer to the state court
complaint. Greg and Diana did not respond to the complaint, and the state court
entered a money judgment against them by default on October 10, 2000, in the
amount of $123,147.95. Ex. 312. The judgment amount includes $99,459.96 in
principal due on the promissory note, plus accrued interest, costs and attorney fees.
Ex. 312.

New Britain then filed a motion for summary judgment against the
remaining defendants – Byron, Marilynn, Nicholas and Sandra. Ex. 314. Prior to
the motion hearing, TFI, which had been in a chapter 12 bankruptcy case since
March 23, 1998, amended its bankruptcy schedules to add the previously unlisted
Teton Pastures property as an asset of TFI and New Britain as a secured creditor.

---

promissory note.

MEMORANDUM OF DECISION - 42

Exs. 316, 319.  As a result of this maneuver, the parties all assumed the state court

foreclosure action was stayed.

Now belatedly involved in TFI's chapter 12 bankruptcy, New Britain

received several adequate protection payments from TFI between November 2002

and December 2003, when TFI's bankruptcy case was dismissed.  Ex. 349.  These

adequate protection payments amounted to $19,200.  Ex. 354.  New Britain

credited the payments against the total amount owed on the promissory note.  Ex.

356–358.

### 3.  Analysis of Title Issues.

As discussed above, under Idaho law, the holder of record title is

presumed to be the owner of real property unless clear, satisfactory and convincing

evidence to the contrary is produced.  *Luce*, 127 P.3d at 173.  A review of the

chain of record title to the Teton Pastures property shows that in 1992, the land

was conveyed by the Thomason parents to Byron, Nicholas and Greg, along with

their respective spouses.  Two more deeds from Doralee to the sons, or the sons

and their spouses, appear in 1993.  It is not until 2003 that the 1976 deed from

Charles and Doralee to TFI is discovered and properly recorded in Teton County.

*See* Exs. 11, 337, 511.

Plaintiffs ask the Court to recognize the 1976 deed as controlling.

The Court declines to do so.  Idaho law provides:

MEMORANDUM OF DECISION - 43

> Every conveyance of real property other than a lease
> for a term not exceeding one (1) year, is void as against
> any subsequent purchaser or mortgagee of the same
> property, or any part thereof, in good faith and for a
> valuable consideration, whose conveyance is first duly
> recorded.

Idaho Code § 55-812. The conveyance "must be recorded by the county recorder

of the county in which the real property affected thereby is situated." Idaho Code

§ 55-808.

Plaintiffs' argument in support of recognizing the almost thirty year

old deed is disingenuous. Plaintiffs argue Greg should have known that TFI

owned the Teton Pastures property such that he cannot be a good faith transferee.

To accept that Greg or his brothers indeed knew of TFI's interests in the Teton

Pastures property prior to discovery and recording of the 1976 deed in 2003,

several questions must be resolved. Why did the brothers purport to individually

execute a mortgage on Teton Pastures property to Mr. Erikson to secure a loan in

1993? How did Byron, Nicholas and Greg supposedly transfer the Teton Pastures

property, along with the Agren property, to TFI by way of the March 27, 1997

agreement, if the brothers believed that TFI owned the property? Why didn't

Byron or Nicholas list Teton Pastures as TFI property on TFI's original bankruptcy

schedules filed in March 1998? And why, in 2001, did Byron, Nicholas, and their

MEMORANDUM OF DECISION - 44

spouses feel compelled to quitclaim their interests in the Teton Pastures property to TFI?

The record before the Court leads it to conclude that any attempt by Charles and Doralee to convey the Teton Pastures property to TFI in 1976 failed. The 1976 deed was never delivered to the sons, nor were they even aware of its existence, until it was discovered and recorded in 2003. In the several deeds executed in 1992 and 1993, Charles and Doralee (along with Charles' probate estate) conveyed the land to their sons and their spouses as individuals. And it was as individuals that the Thomason brothers and their spouses then mortgaged the property to Erikson in an instrument wherein they warrant themselves to be the true owners of the property. Ex. 301.[24]

Based upon the conflicting evidence, the Court is persuaded that it was Charles' intent to ultimately pass on the family farm to his three surviving sons in equal shares. This explains why at least two such deeds to do so were executed and recorded by Charles and Doralee. Exs. 341, 517. Greg and Diana did not join in later conveyances by Byron, Nicholas and their wives to TFI. The

---

[24] The warranty provision of this mortgage is nearly illegible. However, such provision is clearly legible in what the Court understands to have been an identical mortgage document executed by the parties at the same time concerning other property in Madison County, Ex. 302. The Court therefore is comfortable in concluding a similar warranty of title was made by the grantors in the Teton Pastures mortgage.

MEMORANDUM OF DECISION - 45

Court therefore concludes that Greg and Diana own an undivided one-third interest in the Teton Pastures property, subject to the New Britain mortgage.

### 4.  Amounts Due New Britain.

Since the bankruptcy estate holds an interest in Teton Pastures, it is necessary to resolve the status and extent of New Britain's claim in the bankruptcy case.   On the first day of trial, Plaintiffs and New Britain stipulated, despite Plaintiffs' prior allegations, that New Britain's mortgage on the Teton Pastures property was valid.  However, a dispute remains between the parties concerning the proper rate of interest to be charged on the note secured by the mortgage after the makers' default, the total current amount due on that note, and the amount New Britain should be allowed to recover for attorney's fees and costs.  And while calculating the amounts due New Britain would seemingly require simple accounting and arithmetic, the unusual procedural status of this litigation complicates that process.

### a.  Amount Due to New Britain from Debtors on the Default Judgment.

As noted above, six different individuals signed the Erikson note: the three Thomason brothers and their spouses.  Prior to Greg and Diana's bankruptcy, New Britain obtained a default judgment in the state court action which effectively liquidated the amounts due on the obligation, but only as against Greg and Diana.

MEMORANDUM OF DECISION - 46

Upon entry of that state court judgment, Debtors' obligations under the promissory note were merged and subsumed into the judgment. *Allison v. John M. Biggs, Inc.*, 826 P.2d 916, 917 (Idaho 1992). Thereafter, Debtors were obliged to pay the amount of judgment debt, including the accrued interest, attorney fees and costs awarded by the state court, not the amount due on the note. And interest accrued on the judgment at the state legal rate, not the note rate. *Id.*

But the entry of the default judgment did not liquidate the amount due on the note from the other makers (Nicholas, Byron, Marilynn and Sandra) for principal, interest, attorney fees or costs. While Greg and Diana (and now Trustee) may not collaterally attack the amount they owe New Britain under the judgment, neither can Nicholas, Byron or their wives claim any benefit from the fixing of the amounts due under the judgment. Instead, their liability continued to be measured under the terms of the note and mortgage, not the judgment.

After entry of the default judgment in 2000, payments were made on the New Britain obligation through TFI's chapter 12 bankruptcy case. New Britain properly conceded during oral argument that it was not entitled to multiple recoveries for the same debt, and that in enforcing either the promissory note against Byron, Marilynn, Nicholas and Sandra, or the judgment against Greg and Diana, it must give appropriate credit for payments made by any of the signatories.

MEMORANDUM OF DECISION - 47

Therefore, the payments made by TFI to New Britain reduce the amount due from all the parties, including Greg and Diana.

As noted, the judgment against Debtors includes an award of attorney fees and costs which they must pay to New Britain, and interest accrues on the judgment debt at the judgment rate. Idaho Code § 28-22-104(2). It appears $19,200 was paid on the debt by TFI while in the chapter 12 case. Such amount must be credited against the amount Greg and Diana owe on the judgment.[25]

**b.      Amount Due to New Britain from Byron, Marilynn, Nicholas and Sandra on the Promissory Note.[26]**

At the beginning of the trial, Plaintiffs and New Britain entered an oral stipulation on the record as to the validity of New Britain's mortgage as against Byron, Marilynn, Nicholas and Sandra. Neither Trustee nor Debtors have challenged the validity of the New Britain mortgage, either. Absent a contest, the

---

[25] New Britain offered no exhibit containing a proper calculation of the amount due from Greg and Diana on the default judgment. Again, assuming proper credit is given for the TFI adequate protection payments, and that the appropriate judgment interest rate is employed, the parties should be able to agree upon an amount due.

[26] Normally, this Court would decline to adjudicate the amount owed by the nondebtors on this note. However, since the Court has determined that Debtors and their bankruptcy estate own an interest in the property securing the note, and presumably that interest will be liquidated and the secured debt paid, there is ample justification for the Court to adjudicate the amount of the nondebtors' liability on this debt. The Plaintiffs and New Britain presumably agreed with this approach, since they actively litigated that issue in this action.

MEMORANDUM OF DECISION - 48

Court concludes New Britain's mortgage is indeed enforceable as against the

parties' interests in the Teton Pastures property. *See* Exs. 300–305.[27]

Plaintiffs dispute the amount New Britain claims to be due on the

promissory note. New Britain argues it is entitled to a statutory rate of interest of

12% on the unpaid balance, because the promissory note failed to specify a default

interest rate. Plaintiffs argue the 11% interest rate provided for in the promissory

note applies, even after default. The parties base their arguments on differing

interpretations of Idaho Code § 28-22-104, which in relevant part provides:

> (1) When there is no express contract in writing fixing
> a different rate of interest, interest is allowed at the rate
> of twelve cents (12¢) on the hundred by the year on:
>     1. Money due by express contract.
>     2. Money after the same becomes due.
>     3. Money lent. []

Idaho Code § 28-22-104(1).

The Idaho Court of Appeals has applied the statutory interest rate

after money became due on a promissory note even when the document specified

the loan was to be interest-free. The court concluded,

---

[27] Since New Britain elected to obtain a money judgment against Greg and
Diana, rather than proceed to foreclose on their ownership interest in the mortgaged
property, New Britain may have waived its rights under the mortgage. *See Elliott v.
Darwin Neibaur Farms*, 69 P.3d 1035, 1042 (Idaho 2003). However, since Trustee does
not contest New Britain's status as a secured creditor in Debtors' bankruptcy case, the
Court need not consider such issue.

MEMORANDUM OF DECISION - 49

> A lender who agrees that money may be used interest-free has not thereby consented to forego interest after authority to use the money has expired. Such expiration occurs upon the due date of the note or loan agreement. Idaho Code § 28-22-104 prescribes the legal rate of interest on "[m]oney after the same becomes due," absent an express written contract fixing a different rate.

*Camp v. Jiminez*, 693 P.2d 1080, 1087 (Idaho Ct. App. 1984) (citing *Int'l Bus. Machines Corp. v. Lawhorn*, 677 P.2d 507, 511 (Idaho Ct. App. 1984)); *see also Land Dev. Corp. v. Cannaday*, 290 P.2d 1087, 1091 (Idaho 1955). Under this reading of the statute, 12% interest accrues after money lent becomes due, unless a different default rate is specified by the parties in their contract.

The Erikson note provided that interest would accrue on the unpaid balance during the repayment period at the rate of 11% per annum. The full amount owing on the note was due and payable on July 28, 1998. There is no provision in the note fixing an interest rate after full payment was due. Therefore, as interpreted by the Idaho courts, the statute operates to impose an interest rate of 12% after the loan became due on July 28, 1998.

New Britain provided evidence that it is owed $159,138.75 on the promissory note by Byron, Marilynn, Nicholas and Sandra, using a default interest rate of 12% after July 1998 when the repayment of the loan was due. Exs.

MEMORANDUM OF DECISION - 50

357–358.  The Court accepts this sum as the correct amount due from Byron,

Marilynn, Nicholas and Sandra on the note.

### c.  New Britain's Foreclosure Request.

New Britain also requests "authorization" from this Court to

foreclose its mortgage against Byron, Marilynn, Nicholas and Sandra, and to

foreclose its judgment lien against Greg and Diana, or the bankruptcy estate.  New

Britain cited to no bankruptcy law that would allow this Court to "authorize"

foreclosure of either lien.  If by its request New Britain is seeking entry of a

judgment of foreclosure in this action, the Court declines to do so.  Any

foreclosure action should be pursued in state court.  If,  instead, New Britain is

seeking relief from the automatic stay to return to state court to enforce its

judgment lien against Debtors' interests in Teton Pastures, that request is also

denied.  New Britain may seek stay relief under § 362(d), if appropriate, in the

usual fashion, by motion, in the underlying bankruptcy case.

In addition, New Britain asks the Court to enter a money judgment

against Byron, Marilynn, Nicholas and Sandra for the amounts due on the

promissory note.  However, Idaho Code § 6-101, the state law governing actions to

foreclose a real property mortgage, provides that there can be but a single action to

collect a debt secured by a mortgage:

MEMORANDUM OF DECISION - 51

> The Idaho Court of Appeals has applied I.C. § 6-101, holding that the payment of a debt secured by a mortgage must first be sought from the mortgaged property. *Federal Land Bank of Spokane v. Parsons*, 796 P.2d 533, 536 (Idaho Ct. App. 1990). "To collect on the debt, the mortgage must be foreclosed. The creditor may not simply sue on the debt and collect by execution on the judgment." *Federal Land Bank of Spokane v. Parsons*, 777 P.2d 1218, 1222 (Idaho Ct. App. 1989). "Only if there is a deficiency, will the mortgagee be allowed to pursue the other assets of the mortgage debtor." *Federal Land Bank of Spokane*, 796 P.2d at 536.

*Elliot v. Darwin Neibaur Farms*, 69 P.3d 1035, 1042 (Idaho 2003).  While the Court has found it proper to determine the amounts due from Plaintiffs to New Britain under the note and mortgage, it would be inappropriate, and perhaps even contrary to New Britain's interests, to enter a money judgment against the note makers.  The Court will not enter a money judgment against Byron, Nicholas and their wives for this debt.

Finally, New Britain requests an award of attorney fees and costs, as provided by the note, as against Nicholas, Byron, Marilynn and Sandra.  To the extent that New Britain's involvement in this litigation is covered by the note provision allowing the creditor to recover attorney fees, its request may be addressed by separate motion.  At that time, the Court will also consider Plaintiffs' challenges to the reasonableness of the amount claimed.

### C.  The Farmstead Property.

MEMORANDUM OF DECISION - 52

The legal description of the Farmstead property is:

Township 5 North, Range 39 E.B.M., Madison County, Idaho
Section 2: SE1/4SW1/4; SW1/4SE1/4

EXCEPT: Commencing at the NW Corner of the
SE1/4SE1.4 of Section 2, Township 5North, Range 39
East, Boise Meridian, Madison County, Idaho, and
running thence W. 54 feet; thence S. 673 feet; thence
E. 54 feet; thence N. 673 feet to the point of beginning.

ALSO EXCEPT: Commencing at a point that is S.
3935.88 feet from the SE corner of Section 34,
Township 6 North, Range 39 E.B.M., Madison
County, Idaho, and running thence W. 260.00 feet;
thence N. 260.00 feet; thence E 260.00 feet; thence S.
260.00 feet to the point of beginning.  All of the above
described land is contained in the SE1/4SW1/4 of said
Section 2, Township 5 North, Range 39 East, Boise
Meridian, Madison County, Idaho.
Contains 1.55 acres less the County road right-of-way.
This property also contains 70 foot Case Well.

ALSO EXCEPT: Commencing at the S1/4 corner of
said Section 2 (said point is an aluminum cap on a 5/8"
steel rod) and running thence N. 89°27'12" W. 782.00
feet along the section line, more or less, to a county
road right-of-way; thence N. 0°16'48" W. 1082.00 feet
to the True Point of Beginning; thence E. 650.00 feet;
thence N. 0°16'48" W. 272.00 feet to a county road;
thence W. 650.00 feet to a county road intersection;
thence S. 0°16'48" E. 272.00 feet to the True Point of
Beginning.

ALSO EXCEPT: county roads.

Exs. 6, 401, 507.  This parcel is composed of the farm land in Madison County

surrounding the homes in which Doralee and Sonja Thomason reside.

MEMORANDUM OF DECISION - 53

The chronology of relevant conveyances of record concerning this property begins with a deed executed by Charles and Doralee conveying the land to Byron, Nicholas and Greg, recorded on July 8, 1992. Ex. 5. On October 30, 2001, a deed was recorded wherein Greg and Diana transferred their interest in the Farmstead property to Mr. Forsberg to pay the attorney fees they owed to him. Ex. 8. Mr. Forsberg had conferred with Greg and Diana to verify there were no clouds on their title to the Farmstead property, and he obtained a title report and insurance in connection with this transaction. As a result, he believed he was receiving good title as a result of this conveyance. Ex. 403. Later, on March 7, 2002, another deed from Greg and Diana to Mr. Forsberg was recorded to correct an error in the legal description of the property contained in the prior deed. Ex. 9.

Plaintiffs Byron, Marilynn, Nicholas and Sandra argue that Greg and Diana did not have the ability to transfer their interest in the property to Mr. Forsberg in 2001 and 2002 because of the terms of an earlier written memorandum of agreement executed by Charles, Doralee, Byron, Nicholas and Greg on August 25, 1991. Ex. 1. According to Plaintiffs, that memorandum was executed to document a verbal agreement entered into by the family members in December 1984. The written agreement provides in part:

> This memorandum is to acknowledge a verbal agreement entered into between Charles and Doralee Thomason and their now surviving sons, Byron,

MEMORANDUM OF DECISION - 54

Nicholas, and Greg Thomason in December 1984. [sic]
In which it was agreed that Charles and Doralee would
transfer the following properties . . .[Teton Pastures
and Farmstead] and cattle to Byron, Nicholas, and
Greg Thomason.  The house and homestead
property . . . is to be transfered [sic] solely to Byron
Thomason. . . . <u>The above property will remain in the
direct and equal ownership of Byron, Nicholas, and
Greg Thomason, as long as Byron, Nicholas, and/or
Greg Thomason continue to farm</u>.  In the event of their
(Byron, Nicholas, or Greg) death or voluntary leaving
the farm operation, their individual payout will not
exceed the $20,000 . . . and all rights and claims are
cancelled for above said property.

Ex. 1 (emphasis added).  The memorandum also provides that Charles and Doralee

could reside in their home as long as either should live, and that after the deaths of

both Charles and Doralee, the sons would establish a trust to benefit Roger's two

daughters.

Plaintiffs argue this memorandum, which was recorded on June 6,

1992, restricts the brothers' right to convey the Farmstead property.  Because the

agreement was recorded, they argue Mr. Forsberg had constructive notice that the

land was subject to the parties' restrictive covenants.  Plaintiffs argue that title to

the Farmstead property should therefore be quieted in Byron, Nicholas and Greg

because the memorandum required the property to remain in the "direct and equal

ownership of Byron, Nicholas, and Greg[.]"

MEMORANDUM OF DECISION - 55

Mr. Forsberg contends that the July 2002 warranty deed, executed and recorded after the memorandum agreement, whereby Charles and Doralee grant Greg an unrestricted and undivided interest in the property, relieved Greg of any prior restrictions on title, leaving him free to convey good title to Mr. Forsberg.  Alternatively, Mr. Forsberg argues that, even if the memorandum is effective as a restrictive covenant, it terms are no longer binding.  This contention is based on the fact that none of the Thomason brothers are currently farming, and that Greg did not voluntarily leave the farm operation, nor did he receive a payout. On this basis, Mr. Forsberg contends that the terms of memorandum did not prevent the transfer he received from Greg and Diana, and that title should be quieted in Byron, Nicholas and Mr. Forsberg, each with an undivided one-third interest.[28]

"A restrictive covenant is defined as a '[p]rovision in a deed limiting the use of the property and prohibiting certain uses.'" *Thomas v. Campbell*, 690 P.2d 333, 339 n. 2 (Idaho 1984).  Idaho recognizes the validity of covenants that restrict the use of private property.  *Nordstrom v. Guindon*, 17 P.3d 287, 290 (2000) (citing *Brown v. Perkins*, 923 P.2d 434, 437 (1996)).  When interpreting

---

[28]  Trustee asserts no interest in this property and takes no position regarding these arguments.  He agreed to recognize Mr. Forsberg's interest in the Farmstead property as part of their compromise.

MEMORANDUM OF DECISION - 56

restrictive covenants, the courts employ the rules of contract construction, and

absent ambiguity in the language used, the plain meaning applies. *Id.* "However,

because restrictive covenants are in derogation of the common law right to use

land for all lawful purposes, the Court will not extend by implication any

restriction not clearly expressed." *D & M Country Estates Homeowners Ass'n v.

Romriell*, 59 P.3d 965, 969 (Idaho 2002) (citing *Post v. Murphy*, 873 P.2d 118, 120

(Idaho 1994)). All doubts as to a restriction are to be resolved in favor of the free

use of land. *D & M Country Estates Homeowners Ass'n*, 59 P.3d at 969 (citing

*Post*, 873 P.2d at 120). Finally, "[a] fee simple title is presumed to be intended to

pass by a grant of real property unless it appears from the grant that a lesser estate

was intended." Idaho Code § 55-604.

Notably, the restrictions upon which Plaintiffs rely do not appear in a

deed, and in particular, neither the memorandum or its terms are referenced in the

warranty deed that conveyed the Farmstead property to Byron, Nicholas and Greg,

subject specifically to Charles and Doralee's right to live in the house.[29] Ex. 5.

The memorandum agreement was recorded June 2, 1992, Ex. 1; the warranty deed

transferring the property from Charles and Doralee to the sons was signed on

---

[29] The copy of the deed submitted in evidence is illegible in part. However, based upon the arguments of the parties, that the Court can not read all the contents of the deed is not fatal because both parties agree the issues are controlled by the effect given to the 1991 memorandum agreement, Ex. 1, regardless of the contents of the deed.

MEMORANDUM OF DECISION - 57

August 26, 1991, but not notarized or recorded until July 8, 1992, Ex. 5.  There is

nothing in the warranty deed that refers to any restriction on transferability of the

title being conveyed, nor to the earlier recorded memorandum.  And the

memorandum, standing alone, can not be construed to constitute a conveyance,

because it fails to satisfy the statutory requisites for such an instrument.  *See* Idaho

Code § 55-601.   Under these circumstances, the Court declines to enforce the

terms of the memorandum of agreement as valid in restricting a later recorded

conveyance of the property.

Even assuming the memorandum of agreement imposed

enforceable restrictive covenants on the Thomason brothers' ownership and use of

the Farmstead property, by its terms it no longer applied at the time Greg

transferred the property to Mr. Forsberg.  Giving the agreement its plain meaning,

any restrictions applied only so long as Byron, Nicholas and Greg all farmed.  At

the time the property was transferred to Mr. Forsberg, it is undisputed that Greg

was no longer farming.  The testimony also established Greg did not quit farming

voluntarily, and that he did not receive the payout required by the agreement.

As the case law emphasizes,  "all doubts [concerning restrictive

covenants] are to be resolved in favor of the free use of land."  *D & M Country*

*Estates Homeowners Ass'n*, 59 P.3d at 969.  The agreement's effect in this

situation is at best unclear.  The agreement does not provide for what should occur

MEMORANDUM OF DECISION - 58

if two brothers force the other out of the farming operation. Thus, the agreement

can not be enforced to restrict Greg's right to transfer his interest in the property

under these facts. The doubts about the legal effect of the memorandum

agreement must be resolved so as to allow the free use of the land. *Id.*

The deed given by Greg and Diana to Mr. Forsberg constituted a

valid conveyance of an undivided one-third interest in the Farmstead property.

The memorandum of agreement did not restrict that transfer or interest.

### D.  Sonja's House.

#### 1.  The record title.

The legal description for Sonja's house is as follows:

> Commencing at a point that is South 3935.88 feet of
> the Southeast corner of Section 34, Township 6 North,
> Range 39 East, Boise Meridian, Madison County,
> Idaho, and running thence West 260.00 feet; thence
> North 260.00 feet; thence East 260.00 feet; thence
> South 260.00 feet to the point of beginning. All of the
> above described land is contained in the SE 1/4 of the
> SW 1/4 of Section 2, Township 5 North, Range 39
> East, Boise Meridian, Madison County, Idaho. Less
> road right-of-way.

Sched. A, Ex. 516.

The earliest deed involving this property received in evidence was

recorded on December 19, 1984, whereby Roger and Sonja transferred the

MEMORANDUM OF DECISION - 59

property to TFI.[30]  Ex. 6.  The next deed in the chain of title was recorded on

February 25, 2004, wherein TFI transferred the property to Nicholas and Sandra.

Ex. 7.  According to the testimony of Todd Davis, manager of Alliance Title and

Escrow in Rexburg, Idaho, Nicholas and Sandra are the current record owners of

Sonja's House.

There is, however, another deed outside the chain of title through

which Trustee claims an interest in this property for Greg and Diana's bankruptcy

estate.  In the title report compiled by Mr. Davis, there is reference to a deed

recorded on July 8, 1992.  This instrument is characterized by Mr. Davis as a "wild

deed," because it was executed by Charles and Doralee, who at the time held no

record ownership interest in this land, and conveyed the property to Byron,

Nicholas and Greg.  Ex. 5.[31]  Trustee asserts, based upon this wild deed, that Greg,

and now Debtors' bankruptcy estate, owns an undivided one-third interest in

Sonja's House.  Trustee notes that Instrument No. 242485, the memorandum

recorded by the parties on July 2, 1992, requiring property to remain "in the direct

---

[30]  The Court presumes Charles and Doralee transferred the property to Roger and
Sonja by excepting the parcel from the Farmstead property.  No evidence, however, was
presented as to how Roger and Sonja first obtained title to the property.

[31]  Interestingly, this deed is the same deed discussed above by which the
Farmstead property was transferred to Byron, Nicholas and Greg, the effect of which
Plaintiffs contend was restricted by the August 25, 1991 memorandum agreement.  *See*
Exs. 1, 5.

MEMORANDUM OF DECISION - 60

and equal ownership of Byron, Nicholas and Greg," Ex. 1, includes the legal

description of Sonja's House.  In Trustee's brief, he argues that because all the

officers and directors of TFI were involved with the execution of these documents,

and TFI was the record owner of the property, the result is that Sonja's House was

transferred to Byron, Nicholas and Greg such that each would hold an undivided

one-third interest in the property.  Docket No. 132 at 10.

### 2. Analysis.

Plaintiffs insist the chain of title shows that TFI transferred Sonja's

House to Nicholas and Sandra to allow them to apply for a secured loan to raise

capital for TFI.  They argue that although the record of title suggests either

Nicholas and Sandra own the property, or perhaps Byron, Nicholas and Greg

jointly own the property, that all intended that TFI own the property.  Plaintiffs

explain that the property was only transferred to Nicholas and Sandra in order to

allow them to secure a loan to operate the farm with the property as collateral

because Nicholas and Sandra had good credit.  When no loan was obtained,

Plaintiffs contend the property should have been transferred back to TFI because

that was the parties' agreement.  Plaintiffs request the Court, for this reason, quiet

title in TFI's name.  The Court declines Plaintiffs' request because they have not

presented clear, substantial and convincing evidence that the true owner of the

property is not reflected in the recorded deed.  *See Luce*, 127 P.3d at 173 (quoting

*Russ Ballard & Family Achievement Inst.*, 248 P.2d at 79).

The Court also rejects Trustee's arguments that Greg, and now his

bankruptcy estate, owns an individual interest in the property.  As noted above, the

memorandum agreement was insufficient under Idaho law to actually transfer the

property and it does not purport to transfer property but merely to set forth an

agreement among the family members.  *See* Idaho Code § 55-601 *et seq*. (setting

forth the requirements for a conveyance).  TFI is not a party to the agreement, and

even though all of its officers and directors are undoubtably parties to the

agreement, no one signed the agreement in their capacity as officers or directors of

TFI.  *See* Idaho Code § 55-711 (providing for the manner in which a corporation

acknowledges an instrument).

All parties appear to concede that in 1992, TFI was the owner of

Sonja's House.  Therefore, TFI was the only party capable of transferring

ownership of Sonja's House to another.  The deed by which Charles and Doralee

attempted to transfer Sonja's House to Byron, Nicholas and Greg, Ex. 5, was

ineffective because at the time the deed was executed and recorded, TFI, not

Charles and Doralee, was the record owner of the property.  *Luce*, 127 P.3d at 173

(citing *Gardner v. Fliegel*, 120 P.2d 990, 993 (Idaho 1969) (concluding "[a]

MEMORANDUM OF DECISION - 62

grantor can convey nothing more that he or she owns, and ordinarily a grantee
acquires nothing more than the grantor owns and can convey.").

The Court concludes TFI owned Sonja's House until it transferred
the property to Nicholas and Sandra by quitclaim deed recorded on February 25,
2004, Exs. 7, 502.  Greg held no individual ownership interest in the property on
the date he filed the bankruptcy petition to become part of his bankruptcy estate.
*See* 11 U.S.C. § 541(a).[32]

### III.  Trustee's Claims Against Plaintiffs

### A. Trustee's Avoidance Claims.

Trustee challenges several transfers made by TFI or the Thomason
Plaintiffs.  Trustee invokes his avoidance powers in an effort to avoid several
transfers of property and other encumbrances.  He argues these transfers and
encumbrances involved Debtors' property and were made with the intent to
prevent Debtors and Trustee from asserting any interest in the property.

---

[32]  Of course, Plaintiffs seem to acknowledge that TFI is the beneficial owner of
this property, even though Nicholas and Sandra hold legal title.  As the Court has
concluded above, Greg owns one-third of the shares of TFI stock.  In valuing and
liquidating that stockholder's interest, appropriate consideration will presumably be
given to reflect the company's ownership of this parcel of property.

MEMORANDUM OF DECISION - 63

Trustee, exercising his powers under § 544(a), seeks to avoid

conveyances that he claims cloud title to Debtors' one-third undivided interest in

the Agren and Teton Pastures properties.[33]  The statute provides that:

> (a) The trustee shall have, as of the commencement of
> the case, and without regard to any knowledge of the
> trustee or of any creditor, the rights and powers of, or
> may avoid any transfer of property of the debtor or any
> obligation incurred by the debtor that is voidable by--
>
> (1) a creditor that extends credit to the debtor at the
> time of the commencement of the case, and that
> obtains, at such time and with respect to such credit, a
> judicial lien on all property on which a creditor on a
> simple contract could have obtained such a judicial
> lien, whether or not such a creditor exists;
> (2) a creditor that extends credit to the debtor at the
> time of the commencement of the case, and obtains, at
> such time and with respect to such credit, an execution
> against the debtor that is returned unsatisfied at such
> time, whether or not such a creditor exists; or
> (3) a bona fide purchaser of real property, other than
> fixtures, from the debtor, against whom applicable law
> permits such transfer to be perfected, that obtains the
> status of a bona fide purchaser and has perfected such
> transfer at the time of the commencement of the case,
> whether or not such a purchaser exists.

11 U.S.C. § 544(a)(1)–(3).  Under this provision, "the Code grants the trustee 'the

status of a creditor with a judicial lien on all property on which a creditor could

---

[33]  Trustee also seeks to avoid conveyances as to Sonja's House.  Because the
Court has concluded that Debtors held no individual interest in that property, the Court
need not address Trustee's arguments because no property of the Debtors was involved.

MEMORANDUM OF DECISION - 64

have obtained a judicial lien, whether or not such a creditor actually exists. . . . The

rights of the trustee as the hypothetical judicial lien creditor are determined by

state law." *Hopkins v. Gutknecht* (*In re Lewis*), 04.3 I.B.C.R. 133, 135 (Bankr. D.

Idaho 2004) (quoting 5 *Collier on Bankruptcy* ¶ 544.05 (Alan N. Resnick & Henry

J. Sommer eds., 15th ed. Rev. 2004)).  State law also defines the Trustee's rights

as a bona fide purchaser of real property under § 544(a)(3).  *Hopkins v. Wells*

*Fargo Bank Northwest, N.A.*, 02.3 I.B.C.R. 135, 136–37 (Bankr. D. Idaho 2002).

"Section 544(a)(3) allows the avoidance of a transfer of real property by the debtor

to another that is not perfected and enforceable under applicable law as against a

hypothetical bona fide purchaser ("BFP") from the debtor as of the instant the

bankruptcy petition is filed."  *Id.* at 136.

Trustee also seeks to use his powers under §§ 547 and 548 to avoid

transfers made by TFI.  Both statutes allow the trustee to avoid a "transfer of an

interest of the debtor in property."  11 U.S.C. §§ 547(b), 548(a)(1).  State law is

used to determine whether the debtors held an interest in the property transferred.

*In re Tippett*, 338 B.R. 82, 86 (9th Cir. BAP 2006) (citing *Butner v. U.S.,* 440 U.S.

48, 54–55 (1979); *In re Lowenschuss*, 170 F.3d 923, 929 (9th Cir. 1999)).  In this

case, Greg's ownership of stock in TFI "confers no immediate title to any of the

property of the corporation."  *State v. Dunlap*, 156 P. 1141, 1145–46 (Idaho 1916);

*see also Pincock v. Pocatello Gold and Copper Mining Co., Inc.*, 597 P.2d 211,

MEMORANDUM OF DECISION - 65

214 (Idaho 1979).  As a result, Trustee has no statutory power under the

Bankruptcy Code to avoid transfers of property owned by TFI, since those assets

would not constitute Debtors' property.  *See* 11 U.S.C. §§ 547–548.  As a result,

the Court need not address any transfers of property owned by TFI.  The Court will

only address those instances where Debtors' property could arguably be impacted.

### 1. Post-Bankruptcy Mortgage on Agren.

Debtors filed their bankruptcy petition on November 7, 2003.  As

noted above, on that date, TFI owned a two-thirds interest, and Greg and Diana

owned a one-third interest in the Agren property.

On April 18, 2004, TFI granted a mortgage and lien in the Agren

property to Byron, Marilynn, Nicholas and Sandra.  Ex. 500.  The mortgage

document indicates that it is granted "strictly to protect any and all legal creditors

of Thomason Farms, Inc. in light of the recent and possibly illegal demands made

upon Thomason Farms, Inc. by entities demanding funds be paid to them."  Ex.

500 at 2.  Byron testified the entity making allegedly illegal demands on TFI was

Trustee.

While, in Idaho, "[a]ny interest in real property which is capable of

being transferred may be mortgaged . . . , "  Idaho Code § 45-1001,  "[a] grantor

can convey nothing more than he or she owns." *Luce*, 127 P.3d at 173 (citing

*Gardner v. Fliegel*, 120 P.2d 990, 993 (Idaho 1969)).  TFI was unable to mortgage

MEMORANDUM OF DECISION - 66

Debtors' interest in the Agren property because TFI's interest was separate and

distinct from Debtors' interest.  Debtors did not join in the mortgage granted by

TFI to Byron, Nicholas and their spouses, and as a result, such mortgage has no

impact on Debtors' interest in the property.  Thus, there is no transfer of Debtors'

property to avoid.  The mortgage simply does not attach to Debtors' ownership

interests in this property.[34]

### 2.  Pre-Bankruptcy Lis Pendens on Agren and Teton Pastures.

In June 2003, Plaintiffs recorded a lis pendens concerning both the

Teton Pastures property and the Agren property.  Exs. 52–53.  "A lis pendens is a

notice to the world of the existence of a claim affecting certain real property."

*Jerry J. Joseph C.L.U. Ins. Assoc., Inc. v. Vaught*, 789 P.2d 1146, 1148 (Idaho

App. 1990) (citing Idaho Code § 5-505; *Suitts v. First Security Bank of Idaho,

N.A.*, 602 P.2d 53, 57 (1979)).  This Court has recognized "that execution and

recordation of the lis pendens does not expand the substantive contractual rights of

[a party]."  *Hammes v. Tiffany* (*In re Tiffany*), 90 I.B.C.R. 374, 377 (Bankr. D.

Idaho 1990).[35]  However, the Court in *Hammes* held that a lis pendens filed prior

---

[34]  The Court does not decide whether this mortgage may be attacked by Trustee
under state law in his status as a shareholder of TFI.

[35]  Trustee directs the Court to *Rice v. First Arkansas Valley Bank* (*In re May*),
310 B.R. 405 (Bankr. E.D. Ark. 2004) to support Trustee's contention that a lis pendens
is a transfer of property that may be avoided as a preferential transfer under 11 U.S.C.
§ 547.  However, it appears under Arkansas law a lis pendens may create some

MEMORANDUM OF DECISION - 67

to the bankruptcy petition was not avoidable by the trustee using the powers

granted by § 544. *Id.* at 380.

In this instance, each lis pendens was apparently filed to give notice

of the pendency of adversary proceedings pending in connection with the chapter

12 bankruptcy of TFI, which adversary proceedings were later dismissed.[36]  At this

point, the fact that there may have been litigation pending involving these

properties is of little consequence:

> [A] lis pendens does not purport, by itself, to establish
> or to change anyone's legal rights.  Of course, the
> filing of a lis pendens may highlight a possible legal
> problem affecting the property, thereby inducing an
> extra measure of caution by potential purchasers or
> lenders until the litigation is concluded.  But this does
> not mean that any underlying legal rights have been
> altered.  By parity of reasoning, the removal of a lis
> pendens, as the result of a settlement or judgment, has
> no effect on legal rights.  It simply is a signal that a
> dispute over those rights has been resolved.

*Jerry J. Joseph C.L.U. Ins. Assoc., Inc.*, 789 P.2d at 1148–49.   Here, the recorded

lis pendens merely put the world on notice that, at one time, a pending legal action

---

substantive right in property.  *Id.* at 417 (citing *Dupwe v. Worthern Nat'l Bank* (*In re Rising Fast Rentals, Inc.*), 162 B.R. 203, 204 (Bankr. E.D. Ark 1993) ("The Court concludes that [a lis pendens filing], to the extent it perfected or created any additional rights in the subject property, is a preference.").  Under Idaho law, a lis pendens creates no substantive rights in property.  *Jerry J. Joseph C.L.U. Ins. Assoc., Inc.*, 789 P.2d at 1148–49.

[36]  There was no explanation provided by the parties as to why neither lis pendens was released upon dismissal of the adversary action.

MEMORANDUM OF DECISION - 68

may impact the title or other parties' rights in these properties. The legal actions were dismissed. As a result, the lis pendens do not impact Trustee's rights in Agren or Teton Pastures property, and there is no interest to avoid under the Bankruptcy Code.

### 3. Avoidance of the Judgment.

Trustee seeks to employ his avoidance powers to avoid the judgment Plaintiffs obtained against Greg in the chapter 12 adversary proceeding. TFI recorded the judgment against Debtors in Teton County, on August 5, 2002, Docket No. 512, and in Madison County on July 24, 2002, Docket No. 514.

Trustee's arguments concerning the legal basis to avoid the judgment liens created by recording the judgment are less than clear. Trustee suggests he can avoid entry of the judgment as a fraudulent transfer under § 548. However, the Court can not understand how, under these facts, § 548 can help Trustee.

It also appears Trustee may be asserting that the lien Plaintiffs obtained by recording the judgment against Debtors' property should be avoided. However, the Court has not been directed to an applicable provision of the Bankruptcy Code that would allow avoidance. The Court declines to consider avoidance of any judgment lien without a proper request founded upon specific authority granted by the Code.

MEMORANDUM OF DECISION - 69

Finally, Trustee contends that the judgment has been satisfied and, therefore, the liens should be released.  Trustee argues that when, after expelling Greg from the farming operation, TFI sold the house in which Debtors' resided, the proceeds should have been applied in satisfaction of the judgment.  Trustee presented no proof to the Court concerning the amounts TFI retained from the sale that should be offset against the judgment.  Because of this failure of proof, the Court declines to invalidate TFI's judgment lien.[37]

**B. TFI's Post-Petition Actions.**

Asserting Greg's status as a shareholder, Trustee asks the Court to dissolve TFI.  He also seeks to avoid several transfers of corporate property based upon the allegedly prejudicial conduct of TFI's officers and directors toward Greg as a minority shareholder.  In particular, after Greg and Diana filed their bankruptcy petition, it appears that TFI transferred several parcels of real property to Byron, Marilynn, Nicholas or Sandra, arguably reducing the value of Greg's stock interest in the company.  Trustee seeks to avoid these transfers and to dissolve TFI pursuant to Idaho Code § 30-1-1430.

Trustee makes a persuasive argument that the several transfers of corporate property to Greg's brothers and their wives were prejudicial to his rights

---

[37]  Again, the corporation's sale of this house may be an issue relevant to the liquidation of Greg's stock in TFI.

MEMORANDUM OF DECISION - 70

as a minority shareholder, and that the transfers were not motivated by any valid

corporate objectives.  Indeed, Idaho Code § 30-1-1430(2)(b) provides that a

corporation may be ordered dissolved "[i]n a proceeding by a shareholder if it is

established that . . . [t]he directors or those in control of the corporation have acted

or are acting in a manner that is illegal, oppressive or fraudulent, and irreparable

injury to the corporation is threatened or being suffered by reason thereof[.]"  But

those same statutes require that such action be undertaken by "[t]he Idaho district

court designated in section 30-1-1431(1) . . . ." Idaho Code § 30-1-1430.   In turn,

the statutes designate that "Idaho district court" as the one located "in the county

where a corporation's principal office or, if none in this state, its registered office

is or was located."  Idaho Code § 30-1-1431(1).

Corporations are creatures of state law.  *Continental Life Ins. & Inv.*

*Co. v. Hattabaugh*, 121 P. 81, 84 (Idaho 1912).  Since Trustee relies upon his

status as a corporate shareholder for his claims against Plaintiffs, the Court

declines to entertain an action to set aside these transfers and to dissolve TFI.

Trustee is free to pursue such an action in his derivative capacity, as the Idaho law

contemplates, in state court.

## C.  Trustee's Request to Sell Property under § 363(h).

### 1.  Applicable Law.

A trustee may sell both the estate's interest and "the interest of any

MEMORANDUM OF DECISION - 71

co-owner in property in which the debtor had, at the time of the commencement of

the case, an undivided interest as a tenant in common, joint tenant, or tenant by the

entirety." 11 U.S.C. § 363(h). Such a sale may only occur if:

> (1) partition in kind of such property among the estate
> and such co-owners is impracticable;
> (2) sale of the estate's undivided interest in such
> property would realize significantly less for the estate
> than sale of such property free of the interests of such
> co-owners;
> (3) the benefit to the estate of a sale of such property
> free of the interests of co-owners outweighs the
> detriment, if any, to such co-owners; and
> (4) such property is not used in the production,
> transmission, or distribution, for sale , of electric
> energy or of natural or synthetic gas for heat, light, or
> power.

11 U.S.C. § 363(h)(1)–(4); *Schwaber v. Reed* (*In re Reed*), 940 F.2d 1317,

1322–23 (9th Cir. 1991). Rule 7001(3) requires an adversary proceeding be

commenced against the co-owner to obtain an order authorizing a sale pursuant to

§ 363(h), *Lyons v. Lyons* (*In re Lyons*), 995 F.2d 923, 924 (9th Cir. 1993), and this

action satisfies that requirement. Whether to order a sale of co-owned property is

submitted to the bankruptcy court's discretion. *Probasco v. Eads* (*In re

Probasco*), 839 F.2d 1352, 1357 (9th Cir. 1988).

The trustee bears the burden of presenting a prima facie case for each

element required by § 363(h). However, once the trustee presents evidence that

the sale will be a benefit to the bankruptcy estate, "the burden shifts to the

MEMORANDUM OF DECISION - 72

[opposing party] to show facts indicating why this sale should not be approved."

*Grabowski v. Sapir* (*In re Grabowski*), 137 B.R. 1, 3 (S.D.N.Y. 1992) *aff'd mem.*

970 F.2d 896 (2d Cir. 1992) (citing *Camerson v. Roemelmeyer*, 389 F.2d 599, 601

(5th Cir. 1968)).  As explained by the court in a later decision arising in the same

bankruptcy case, this burden shift represents

> the usual rule in a civil case (like this one): the party
> with the burden of proof has the burden of going
> forward and making out a prima facie case, the other
> party has the burden of rebutting that prima facie case,
> and the party with the burden of proof (in this case, the
> Trustee) must ultimately persuade the trier of fact by a
> preponderance of the credible evidence.

*Sapir v. Sartorius*, 230 B.R. 650, 656 (S.D.N.Y. 1999).

The Ninth Circuit has not addressed the burdens of proof implicated

under § 363(h).  The Court considers the reasoning in the above cases persuasive

and concludes that once Trustee presents evidence establishing a prima facie case

for a sale free and clear, it is up to the co-owner to prove that the detriment to the

co-owner should prevent the sale.

## 2.  The Agren Property.

The bankruptcy estate owns an undivided one-third interest in the

Agren property.  It is farm land.  Byron testified this property could easily be

partitioned.  However, because Byron lives on land adjoining the Agren property,

he expressed no interest in consenting to a partition.  Trustee testified that the

MEMORANDUM OF DECISION - 73

problem he foresees in partitioning the property is the existence of multiple liens

against the property.  After reviewing the title report prepared at Trustee's request

in April 2004, it appears there is at least one federal tax lien (with a notation that

others are possible because the taxes are delinquent), TFI's $86,000 judgment lien

against Greg, a $264,605 lien for the sums due UAP Northwest from TFI, and a

$28,546.42 lien in favor Bart Davis, TFI's bankruptcy attorney.  Title Report at

Sched. B-Section 2, Docket No. 514.  Trustee contends there is no way to allocate

these liens to the individual parcels that would result from a partition of the

property.  Trustee testified that he believes the creditors will insist on maintaining

the property as a whole to secure their debts, thus necessitating a sale of the

property as a whole to pay off the valid liens and divide the excess between the co-

owners and the bankruptcy estate.

        Other bankruptcy courts have considered the extent to which a

property is encumbered in determining whether it is impracticable to partition

property.  *See Haley v. Crow Canyon Office Park Partners*, 100 B.R. 13, 15

(Bankr. N.D. Cal. 1989) (holding "the Court cannot apportion the Bank's deed of

trust so that only a portion of the real property secures only a proportionate part of

the debt."); *Ray v. Ray* (*In re Ray*), 73 B.R. 544, 548–49 (Bankr. M.D. Ga. 1987)

(considering overlapping liens as one factor in determining that partition was

impracticable).  In this case, the Court concurs with Trustee's analysis – it would

MEMORANDUM OF DECISION - 74

be difficult indeed to allocate the liens to the separate parcels created if the parcel was partitioned. Therefore, while there are no real physical impediments to a partition, the Court is persuaded that in this context, it would be impracticable. The first requirement for a § 363(h) sale of the Agren property is therefore satisfied.

The second factor of § 363(h) is also met. The Court finds that the bankruptcy estate would likely realize significantly less in any attempt to sell an undivided one-third interest in the Agren property than by a sale of the entire parcel. Given the history of litigation over this land, and that a minority interest is at stake, it is unlikely a willing purchaser would be found to become a co-owner with the Thomason brothers.

Trustee testified that he believed the sale of the Agren property would benefit the bankruptcy estate. No other evidence was provided on this issue. Moreover, Plaintiffs presented no evidence to establish a significant detriment would be experienced by TFI if its interest in the property was also liquidated at this time. As a valuable asset of the bankruptcy estate, Trustee is duty-bound to, in some manner, convert that interest to cash for the benefit of Debtors' creditors. Therefore, the Court concludes Trustee has adequately shown a benefit would be derived from the sale of this land. And it is undisputed that the Agren property is not used in the production, transmission, distribution or sale of

MEMORANDUM OF DECISION - 75

electrical energy or synthetic gas.  Therefore, the third and fourth elements of
§ 363(h) are also satisfied.

In an exercise of its discretion, the Court concludes Trustee has

shown that the Agren property should be sold free and clear of the co-owner's

interest in the property as authorized under § 363(h)(3).

### 3.  The Teton Pastures Property.

The testimony established that, given the irregular terrain of the

Teton Pastures property, which consists of both high ground and low ground with

water, a partition of this parcel would be impracticable.  Although the property

may have been originally purchased as separate lots, each with road access, the

testimony indicated that there would be no practical method now of splitting the

property into parcels of roughly equal physical characteristics, quality and value.

Next, for the same reasons discussed above as to the Agren property,

sale of the estate's undivided interest would realize significantly less than a sale of

the property as a whole given the litigation associated with the property.

Trustee testified that he believed a sale of Teton Pastures would net a

benefit to the bankruptcy estate.  He believes, based upon his experience with the

sale of property and his knowledge of the property's location, the market value of

the property should be approximately $500,000.  In addition, Trustee testified that

if the property is sold for market value, such a sale would generate funds adequate

MEMORANDUM OF DECISION - 76

to pay the majority of the claims of Debtors' creditors, other than those submitted by Plaintiffs, which claims he contests. The Court finds Trustee has proven the sale would be a benefit to the estate.

While Byron testified he does not want the Teton Pastures property sold, the co-owners presented no persuasive evidence that a sale would result in a significant detriment. While the Court could speculate that the loss of the property may detrimentally impact the cattle operation, there was no evidence offered that other suitable pasture ground is not available in this region. Therefore, the Court will not presume that the loss of that property by TFI would outweigh the benefit of an orderly liquidation by Trustee. This is particularly true when, as in this instance, the co-owner is also a creditor who could benefit from the sale.

Finally, the testimony established the Teton Pastures property is not used in the production, transmission, distribution or sale of electrical energy or synthetic gas.

In the exercise of its discretion, the Court finds and concludes the factors required by § 363(h) have been satisfied so as to allow for a sale of the Teton Pastures property free and clear of the co-owners' interest.

## Conclusion

In sum, the Court has concluded as follows:

MEMORANDUM OF DECISION - 77

1.  Plaintiffs' attempt to foreclose upon Greg's shareholder interest in TFI was ineffective.  Greg's bankruptcy estate therefore continues to hold an interest in that stock.

2.  Byron owns the cattle.

3.  Debtors Greg and Diana Thomason, and now their bankruptcy estate, own an undivided one-third interest in the Agren and Teton Pastures properties.

4.  Interest accrued on the unpaid balance due from Byron, Marilynn, Nicholas and Sandra to New Britain on the Erikson promissory note at the rate of 12% after the note became due and payable in full.

5.  Byron, Nicholas and Mr. Forsberg each own an undivided one-third interest in the Farmstead property, subject to any community property interest of their wives.

6.  Neither Greg nor his bankruptcy estate holds an enforceable interest in the Sonja Thomason House property.

7.  The mortgage asserted by Byron, Nicholas and their spouses against the Agren property is not enforceable against Greg's undivided one-third interest, now held by the bankruptcy estate.  In addition, the lis pendens recorded concerning the property created no legal rights in that property.

MEMORANDUM OF DECISION - 78

8.  Trustee may not avoid the transfers of property made by TFI using his bankruptcy powers.  If Trustee chooses to challenge these transfers under state law as a stockholder in TFI, or to ask that TFI be judicially dissolved, he must pursue an action in state court.

9.  Trustee may sell the Agren and Teton Pastures properties free and clear of the co-owners' interests therein pursuant to 11 U.S.C § 363(h).

The Clerk will confer with counsel regarding available dates for trial of TFI's dischargeability claims against Greg and Diana.  Unless otherwise ordered, no final judgment will be entered until completion of the second trial phase and resolution of the discharge issues.

Dated:  June 9, 2006

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 79